Michael KELLY, Plaintiff,

v.

CITY OF SAN JOSE, et al., Defendants.

No. C 86 20526 (RPA).

United States District Court, N.D. California.

Feb. 26, 1987.

Kevin Domecus, Walkup, Shelby, Bastian, Melodia, Kelly & O'Reilly, San Francisco, Cal., for plaintiff.

Scott A. Ross, San Jose, Cal., for defendants.

MEMORANDUM AND ORDER

OPINION AND ORDER RE DISCLO-
SURE OF CONFIDENTIAL INFOR-
MATION IN POLICE FILES

WAYNE D. BRAZIL, United States
Magistrate.

This is a civil rights action brought under
42 U.S.C. sec. 1983. Plaintiff alleges that
City of San Jose Police Officer George
Graham violated plaintiff's rights under
the United States Constitution by using
excessive force when arresting plaintiff on
March 30, 1986. The pretrial dispute ad-
dressed by this OPINION AND ORDER
arises out of plaintiff's request that de-
fendant City of San Jose produce certain
documents that it deems confidential. The
requested documents include files generat-
ed investigating plaintiff's alleged offense,
complaints by citizens against officer Gra-
ham and internal affairs investigation files
generated in response to such complaints,
forms used by the police department in
recording and processing complaints by cit-
izens against police officers, complaints
lodged against officer Graham by other
officers or his superiors (so called "admin-
istrative complaints"), reports of injuries
suffered by other persons while being ar-
rested by Officer Graham, and manuals,
policy statements, memoranda or any other
documents that discuss arrest techniques
or use of force by police officers in effect-
ing arrests.

Defendant City of San Jose produced the
"crime report" for plaintiff's arrest but
refused to produce any of the other re-
quested documents, purporting to invoke
the "government privilege" recognized in
*Kerr v. U.S. District Court for the North-
ern District of California,* 511 F.2d 192
(9th Cir.1975), aff'd 426 U.S. 394, 96 S.Ct.
2119, 48 L.Ed.2d 725 (1976), as well as
protections afforded by California Penal
Code sections 832.7 and 832.8, by California
Evidence Code sections 1040 and 1043, and
by the California Constitution's recognition

of the right of privacy. In the paragraphs
that follow the court clarifies the sources
and scope of the protections available to
documents of this kind,[1] sets forth the pro-
cedures public agencies must use when
seeking protection for them, and describes
with particularity the kind of analysis a
court must employ when deciding whether
information that falls within the ambit of
the privilege nonetheless must be disclosed.

SOURCES OF CONFUSION IN ANALY-
SIS OF ASSERTIONS OF PRIVI-
LEGE ,BY LAW ENFORCEMENT
AGENCIES

There has been considerable confusion
about which "privileges" state or local law
enforcement agencies may invoke when a
plaintiff suing under federal civil rights
statutes seeks to discover confidential in-
formation. It is impossible to think clearly
about scope of protection, and about the
nature of the analysis a court must employ
to decide whether given information or
communications must be disclosed, without
knowing which privilege is in issue. Dif-
ferent privileges are inspired by different
objectives and policy considerations, and
the particular objectives and policy consid-
erations that inspire a given privilege play
a major role in determining the scope of
that privilege (fixing the kinds of informa-
tion or communications to which it can of-
fer at least some protection) as well as the
nature of the analysis courts must use
when deciding whether that . privilege
should block discovery of particular infor-
mation.

■ At the outset it is important to em-
phasize that in a civil rights case brought
under federal statutes questions of privi-
lege are resolved by federal law. *E.g.,
Kerr v. U.S.D.C., supra,* 511 F.2d at 197
[quoting *Heathman v. United States Dis-
trict Court,* 503 F.2d 1032, 1034 (9th Cir.
1974) ]. State privilege doctrine, whether
derived from statutes or court decisions, is
not binding on federal courts in these kinds

---

1. This opinion builds from the thoughtful work
of United States Magistrate Joan Brennan. *Pa-
lomaria v. Griffen,* Case no. C–83–3921 JPV

(JSB) (MEMORANDUM AND ORDER, April 18,
1984).

of cases. *E.g., Breed v. United States District Court*, 542 F.2d 1114, 1115 (9th Cir.1976) (citing *Kerr v. U.S.D.C., supra*, 511 F.2d 192). It obviously would make no sense to permit state law to determine what evidence is discoverable in cases brought pursuant to federal statutes whose central purpose is to protect citizens from abuses of power by state and local authorities. If state law controlled, state authorities could effectively insulate themselves from constitutional norms simply by developing privilege doctrines that made it virtually impossible for plaintiffs to develop the kind of information they need to prosecute their federal claims.

 None of this means, however, that federal courts should wholly ignore state laws, or rights recognized by state governments, when analyzing privilege issues in civil rights cases. As a matter of comity, federal courts should attempt to ascertain what interests inspire relevant state doctrine and should take into account the views of state authorities about the importance of those interests. *See Skibo v. City of New York*, 109 F.R.D. 58, 61 (E.D. N.Y.1985). *See also Breed v. U.S.D.C., supra*, 542 F.2d at 1115 (stating that state law, while not binding, can be a useful referent). When it is clear that a desire to ward off civil rights plaintiffs played no role in the formulation of state privilege rules it would be irrational for a federal court to assume that it could learn nothing from state or local views about the severity of the problems that could be created if certain kinds of information were available to civil litigants. Likewise, federal courts generally should give some weight to privacy rights that are protected by state constitutions or state statutes. Of course, ultimate responsibility for deciding how much weight to ascribe to such interests, and how that weight compares with the significance of competing interests, must reside with the federal courts. *See Skibo v. City of New York, supra*, 109 F.R.D. at 61; *Wood v. Breier*, 54 F.R.D. 7, 11 (E.D.Wis. 1972).

Some of the confusion about what the privilege is that local law enforcement authorities may invoke, and how far it extends, is attributable to the fact that there has been no codification of federal privilege law. Congress rejected the Advisory Committee's effort in the early 1970's to reduce federal privilege law to a comprehensive set of rules. *See generally Proposed Fed. R.Evid.*, 56 F.R.D. 183 (1972). Instead, Congress left the courts to develop privilege doctrine on a case by case basis. In this process busy judges have sometimes drawn without much discrimination from lines of reasoning developed in circumstances that have little or nothing in common with the kind of case involved here, i.e., a civil rights lawsuit against police officers and the department or city for which they work. Thus some courts have borrowed concepts from cases that involved military, diplomatic, or national security secrets (where the privilege properly invoked is the *"state secrets"* privilege), or from cases that involved confidential communications between the President of the United States and his high level advisors (where the privilege properly invoked is the *"executive"* privilege), or from cases in which litigants sought to discover recommendations, opinions, or ideas and analyses that governmental employees generated as part of the process of developing public policy (where the privilege properly invoked is the *"deliberative process"* privilege). Ideas also have crept into opinions in this subject area from cases involving (1) the so-called "self-critical analysis" privilege, *see, e.g., Skibo v. City of New York*, 109 F.R.D. 58, 83, (E.D.N.Y.1985) (to what extent, if any, this "privilege" differs from the "deliberative process" privilege is unclear), (2) the Freedom of Information Act (which is not a source of privilege at all, *Kerr v. U.S.D.C., supra*, 511 F.2d 192, 197), (3) the right of privacy (which can receive some level of protection from state constitutions and statutes as well as from the United States Constitution), *see, e.g., Denver Policemen's Protective Association v. Lichtenstein*, 660 F.2d 432 (10th Cir.1981), (4) the work product doctrine,

see, e.g., *Kaiser Aluminum & Chemical Corp. v. United States*, 157 F.Supp. 939, 141 Ct.Cl. 38 (1958), and (5) the Jencks Act and other doctrines related solely to the separate world of criminal procedure.

■ Transporting ideas developed in these other contexts into thinking about civil rights cases against local police departments can lead courts to develop inappropriate doctrine or modes of analysis. For example, if a court looked to cases involving state secrets for guidance it might conclude that confidential material developed by law enforcement agencies should be protected by an essentially "absolute" privilege, meaning that once a court determined that the information in issue fell within the categories covered by the privilege, virtually no showing of need could be sufficient to compel disclosure. *United States v. Reynolds*, 345 U.S. 1, 11, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953); *In re "Agent Orange" Product Liability Litigation*, 97 F.R.D. 427 (E.D.N.Y.1983) (citing *Reynolds, supra* ). It makes no sense simply to transport law from one line of cases to another, however, without first comparing the importance of the interests that privilege doctrine would be protecting in the two different settings. The reason the courts have developed a virtually "absolute" privilege to protect state secrets is that the interests that would be threatened by disclosure when that privilege is properly invoked are, by hypothesis, immensely important. In fact, the "state secrets" privilege was developed for the express purpose of protecting the kind of information that is most vital to the nation's survival. *See United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). By definition, confidential information cannot qualify as a "state secret" unless it is of vital importance.

When we compare cases involving the "state secrets" privilege with cases involving confidential information of lesser significance we perceive that courts have developed two different devices for controlling the reach of privileges. One device consists of imposing strict limits on the kinds of material that can qualify for any protection at all, i.e., courts use such demanding criteria that only a few kinds of communications fall within the qualifying category. See *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and its progeny. For an example of this approach (which I do not endorse) in a civil rights case, *see, e.g., Boyd v. Gullet*, 64 F.R.D. 169, 178 (D.Md.1974) (only police files of ongoing investigations are privileged). The second device for controlling the reach of privilege comes into play not at the "definition" stage but at the "application" stage. Courts that face privileges whose initial reach (scope) is broadly defined may develop "tests" or "modes of analysis" that permit them to conclude that even though a particular communication falls within the categories that are entitled to some level of presumptive or qualified protection, the communication must be disclosed because the party asserting the privilege has failed to make the showing necessary to satisfy the relevant "test". *See, e.g., Wood v. Breier* 54 F.R.D. 7 (E.D.Wis. 1972).

■ Because the protection for material that falls within the category of "state secrets" is absolute, courts attempt to impose rigorous limits on the scope of the privilege. In other words, because they know that once something is deemed covered by the privilege it is essentially sacrosanct, courts will deem something to be so covered only after the agency asserting the privilege has satisfied very demanding procedural requirements. *See United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). *See also Branch v. Phillips Petroleum Co.*, 638 F.2d 873, 882 (5th Cir.1981) (stating that the purpose of the *Reynolds* procedures is to insure that the government privilege is not invoked lightly or mistakenly). I believe that courts should afford a comparable "absolute" protection to information collected by a police department only if (1) they are convinced that the interests threatened by limited disclosure (under a tightly drafted protective order) of that information are immensely

important (both absolutely and in comparison to the interests that would be advanced by limited disclosure) and (2) they are prepared to impose strict limits on the reach of the privilege, e.g., by refusing to honor its invocation unless the agency seeking protection under it satisfies the most demanding procedural requirements.

For reasons set forth below, this court is not satisfied that most information gathered by police departments satisfies the first of these conditions. In addition, this court believes that imposing the second condition would disserve legitimate interests of law enforcement agencies because it would leave some of the information they generate without even the limited protection that a balancing approach affords. Law enforcement agencies develop a huge range of kinds of information, some of which, in isolation, would not appear especially important. Yet there may well be circumstances in which that kind of information should be protected. Since courts would be reluctant to offer such material any protection at all if they had to deem it absolutely privileged, adopting a more flexible analysis of privilege issues in this context affords more protection to police interests by creating the possibility of preserving the confidentiality of information that happens to fall in less "dramatic" categories. In other words, an important argument in favor of rejecting an absolute privilege for information gathered by police departments is that courts will be willing to consider more kinds of information as falling within the scope of the privilege (thus entitled to some level of qualified protection) if they can use a more flexible analysis thereafter to decide whether, in a given situation, a plaintiff should have access to the material.

Courts also must guard against wholesale, uncritical importation into civil rights cases of doctrine developed in cases dealing with the "executive" privilege. Such importation is potentially misleading because the executive privilege is inspired, at least in part, by a policy consideration that plays little or no role in cases against police officers. At the root of the executive privilege is concern about preserving a constitutionally appropriate balance and separation of the largely disparate powers of the three great branches of the federal government. In the seminal cases about executive privilege the courts have been concerned primarily about finding an appropriate accommodation between the constitutionally independent status and needs of the presidency of the United States and the needs of our system of justice. *See United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) (holding that the presidential privilege is "inextricably rooted in the separation of powers under the constitution"). These high level, politically most sensitive concerns simply are not present in cases where an individual sues members of a local police department. State or local law enforcement personnel or agencies are entitled to little, if any, help from the separation of powers doctrine, which is the key source of executive privilege. This is all the more true in a case where a plaintiff alleges that local police officers have violated federal laws, laws written into the federal Constitution in order to protect individuals from abuses of power by state and local governments, including law enforcement agencies, laws which the executive branch of the federal government (the true beneficiary of the separation of powers doctrine) is charged with responsibility to enforce.

Similarly, courts could apply the "deliberative process" privilege to most kinds of information generated by police departments only if they are willing to stretch, in some instances almost beyond recognition, the policy rationale that supports that privilege. As originally developed, the deliberative process privilege was designed to help preserve the vigor and creativity of the process by which government agencies formulate important public *policies*. *See, e.g., Branch v. Phillips Petroleum Co.*, 638 F.2d 873, 881–82 (5th Cir.1981). The principal idea that inspires the privilege is that the people who contribute to *policy* formulation will be less afraid to offer honest (albeit painful) analyses of current and con-

templated policies, and will be less shy about suggesting bold, creative (and sometimes hairbrained) policy alternatives, if they know that their work is not likely to be disclosed to the public. As I will suggest below, it is not at all clear to me that the basic assumption that informs this body of law is well-made. For present purposes, however, the point is this: the rationale that supports this privilege should fix the limits of its reach. The "deliberative process" privilege should be available only to communications that contribute to a deliberative process.

Through time, and under pressure to find some "privilege" that would cover additional material, some courts have broadened the "deliberative process" privilege so that it can be invoked not only for communications that contribute to the formulation of 'important public "policy", but also for communications that might contribute to the making of any "decision" by a public official. So broadened, there is very little information that would not be entitled to some level of protection. That is the rub. In a society where government is supposed to be open, where it is supposed to be the servant of and responsive to the people, and where statutes supposedly assure the public access to most information developed by government, *see, e.g.,* Freedom of Information Act, 5. U.S.C. Section 552, does it make sense for courts to create a body of privilege doctrine that sweeps so broadly that virtually every datum collected by government is presumptively shielded from disclosure? Since privileges derogate the search for the truth they are supposed to be narrowly construed. *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). If the "deliberative process" privilege entitles the material it covers to a truly meaningful level of protection (for example, if the "test" courts use to determine whether covered material should be disclosed imposes a substantial burden of justification on the plaintiff and thus gives the government a real edge in the contest), the "deliberative process" privilege should be limited to communications designed to contribute, directly,

to the formulation of important public policy. *See Burka v. New York City Transit Authority,* 110 F.R.D. 660 (E.D.N.Y.1986) (suggesting that the deliberative process privilege only applies to opinions, evaluations, and recommendations and cannot operate at all when a plaintiff is pressing a non-frivolous challenge to the deliberative process itself). So limited, this privilege would offer no protection at all to most of the kinds of information police departments routinely generate.

■ It also is clear that the work product doctrine rarely, if ever, would offer protection to the kinds of information in issue in this case. The work product doctrine does not apply to information collected or communications made in the normal course of business. It applies only to material generated primarily for use in litigation, material that would not have been generated but for the pendency or imminence of litigation. *See generally Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Since police departments are under an affirmative *duty,* in the normal course of serving their public function, to generate the kind of information at issue here, the policies that inspire the work product doctrine are wholly inapplicable. *See, e.g., Spell v. McDaniel,* 591 F.Supp. 1090, at 1119, 1120 (E.D.N.C.1984).

The purpose of the discussion in the preceding paragraphs is to demonstrate the dangers of importing into this arena doctrines that were developed in quite different settings to protect government interests or promote policies that have little or no bearing on most of the kinds of information generated by police departments. Privilege doctrine should be *tailored* to accommodate the specific kinds of competing interests that are in issue in the situations in which the privilege is invoked. Courts should look afresh at the situation presented when an individual who is suing under a federal civil rights act seeks information from a state or local law enforcement agency and should craft a body of privilege doctrine that is not confused by borrowings from other areas. This opinion

is intended to contribute toward those ends.

## A PRIVILEGE DOCTRINE TAILORED TO CIVIL RIGHTS CASES AGAINST STATE AND LOCAL LAW ENFORCEMENT AGENCIES

One small step toward conceptual cleanliness in this area consists of choosing a name for the privilege that fits the kind of information likely to be in issue in civil rights cases against police officers or departments and that is not likely to prompt courts to adopt an inappropriate mode of analysis or to impose inappropriate procedural requirements. Among the possibilities already on the judicial landscape the two most attractive candidates are the "governmental" privilege and the "official information" privilege. I prefer the latter because it is broad enough to cover all the disparate kinds of data and communications that can be involved in these types of cases, because it has not been extensively used in other, potentially misleading environments, and because the analysis courts are most likely to associate with this phrase is case by case balancing. The phrase "government privilege", by contrast, has implications that might cause it to be equated with the "deliberative process" privilege, which is at once too narrow and too generous to the government for the kinds of cases in issue here. The word "government" might lead courts to assume that the privilege only applies when "politics" or "policy formulation" interests are directly implicated. For reasons to be made clear momentarily, such a reading of the privilege would not be broad enough to protect legitimate law enforcement interests. Hereafter, I will refer to the privilege in issue in these kinds of cases as the "official information" privilege. See Branch v. Phillips Petroleum Co., 638 F.2d at 881 (5th Cir.1981) (referring to the common law version of the official information privilege). See also Proposed Fed.R. Evid., Rule 509(a)(2), 56 F.R.D. 183, 251 (1972) (which would have created a privilege for "official information").

■ To decide what kind of protection this privilege should offer to information collected by local law enforcement agencies courts must weigh and compare the interests that are in competition in this environment. Those interests generally fall into five categories: interests of law enforcement, privacy interests of police officers or citizens who provide information to or file complaints against police officers, interests of civil rights plaintiffs, the policies that inform the national civil rights laws, and the needs of the judicial process. Each of these five categories covers a wide range of specific interests, and within that range the magnitude or importance (weight) of the specific interests varies greatly, both in the abstract and depending on the situation in which they are implicated. Courts that have recognized this fact of life have attempted to balance the weights of the *categories* of interests in order to fashion a "test" for deciding privilege issues in this context. *See Elliott v. Webb*, 98 F.R.D. 293 (D.Idaho 1983); *Frankenhauser v. Rizzo*, 59 F.R.D. 339 (E.D.Pa.1973).

In this abstract balancing of categories courts have assumed that disclosure of at least some kinds of information developed by law enforcement could harm significant governmental interests. Courts also have recognized that efforts to discover information from police files sometimes implicates rights of privacy that are not inconsequential. *See, e.g., Denver Policemen's Protective Association v. Lichtenstein*, 660 F.2d 432 (10th Cir.1981). Most courts simultaneously have recognized, however, that there is great weight in the competing categories of interests: through constitutional amendment and national legislation the people have made it clear that the policies that inform the federal civil rights laws are profoundly important, *see Wood v. Breier*, 54 F.R.D. 7 at 11, 12 (E.D.Wis.1972) [citing *Black v. Sheraton Corp. of America*, 47 F.R.D. 263, 267 (D.D.C.1969) ], public confidence in our system of justice is of comparable significance and is threatened when relevant evidence is not made available, *see Denver Policemen's Protective Associa-*

*tion v. Lichtenstein, supra,* 660 F.2d at 436 [quoting *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974)], and independent of that public perception of the system there are few things more important than doing justice in fact in individual cases. *See, e.g., Wood v. Breier, supra,* 54 F.R.D. at 13.

Comparing the relative importance of the interests in the competing categories, most courts have concluded (and I agree) that it would be wholly inappropriate to create an "absolute" privilege for confidential information in police files. Instead, the courts have granted such information only a "qualified" privilege, meaning that in some circumstances it might be discoverable. *See, e.g., Denver Policemen's Protective Association v. Lichtenstein, supra,* 660 F.2d at 437.

Unfortunately, there is considerable inconsistency in the analytical process courts have used to decide when to uphold and when to penetrate assertions of privilege in this environment. Some courts have used an "open" balancing, meaning that they compare the weight of the specific interests that are competing in particular situations and that when they put those interests on the judicial scales neither sides starts with an advantage. *See, e.g., Frankenhauser v. Rizzo,* 59 F.R.D. 339 (E.D.Pa.1973). Other courts, by contrast, have adopted a "weighted" balancing approach, meaning that before they begin the process of ascribing weight to the specific competing interests in a given case they add weight to one side of the scale. See, e.g., *Wood v. Breier, supra,* 54 F.R.D. at 13. Some courts add the weight at the outset on the government's side, others on the side of the plaintiff. Courts that have adopted some version of the weighted balancing approach have done so because when they compared the importance of the general categories of interests that are in competition in these kinds of cases they concluded that the interests on one side were generally likely to

be appreciably weightier than the interests on the other. The effect of adopting a "weighted" balancing approach is to create a presumption in favor either of secrecy or disclosure (depending on which side is the beneficiary of the added weight) and thus to impose a burden of persuasion (or justification) on the party against whom the scales are weighted before the case-specific analysis (balancing) begins. At the very least, a weighted balancing approach creates a doubt resolution rule (in close cases, the side that entered the contest with the weight already on its side of the scale wins). But if the weight added to one side before the case-specific balancing begins is large, the effect can be to impose a heavy burden of justification on the opposition.

▪ In my view there are several considerations that justify adopting in these kinds of civil rights cases *a balancing approach that is moderately pre-weighted in favor of disclosure.*[2] As a general proposition, the public interests in the categories favoring disclosure (the policies underlying our civil rights laws, public confidence in the court system, and doing justice in individual cases) clearly outweigh the public interests in favor of secrecy (e.g., not compromising procedures for self-discipline within police forces or the privacy rights of officers or citizen complainants). As I suggest below, there has been substantial exaggeration of the size of the harm that limited disclosure might do to concededly legitimate law enforcement interests. And in the relatively rare case where there is a very real threat to obviously important law enforcement interests (as there could be, for example, if a plaintiff were seeking the names of confidential informants in on-going criminal investigations, or wanted to learn operational plans for imminent police activities), the moderate pre-weighting in favor of disclosure will not disable courts from protecting those law enforcement interests.

**2.** For the reasons explained in the text that follows, I do not endorse the unweighted balancing that was suggested in *Proposed Fed.R.*

*Evid. 509(c),* 56 F.R.D. 183, 251–52 (1972) for the analysis of the official information privilege.

There are additional considerations that support the conclusion that it is appropriate to adopt a balancing test that is moderately pre-weighted in favor of disclosure. Such pre-weighting is consistent with the well-established notion that because privileges operate in derogation of the truth finding process the law places the burden of proving all the elements essential to invoking any privilege on the party seeking its benefits. The pre-weighting also is consistent with the related idea that privileges generally are to be narrowly construed, and that doubts about their applicability are to be resolved in favor of disclosure. *See generally United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). Finally, it is important to emphasize that in many situations what would pose the threat to law enforcement interests is disclosure to the public generally, not simply to an individual litigant and/or her lawyer. Thus the weight of some of the interests in the law enforcement category may be reduced because courts routinely enter tightly crafted protective orders under which only a single litigant, sometimes only that litigant's lawyer, has access to the sensitive information.

I hasten to add that the pre-weighting in favor of disclosure should not be so substantial that it is virtually impossible for law enforcement to protect any information. Such substantial pre-weighting would render the official information privilege virtually meaningless. And clearly there will be situations in which the case specific balancing should result in preserving the confidentiality of the law enforcement information.

What the interests of law enforcement are, and how much weight to ascribe to them, can vary with both the kind of information in question and the situation in which it is being sought. For example, law enforcement usually will have a much greater interest in preserving the confiden-tiality of names of citizen informants in on-going criminal investigations than in keeping secret the factual information provided by percipient witnesses to events that are long since past and about which there will be no prosecution or internal affairs follow-up. *See, e.g., Spell v. McDaniel,* 591 F.Supp 1090, 1119 (E.D.N.C.1984). It is important to emphasize, however, that it is by no means inconceivable that a situation could develop in which disclosure of even information in the latter category could cause harm to a significant government interest.

Since there are so many different categories of information that plaintiffs might seek to discover in these kinds of cases, and since it is impossible to foresee all the kinds of situations in which preserving the confidentiality of different kinds of information might be important, it makes no sense to decide that certain kinds of information, regardless of the context in which it is sought, should be wholly outside the reach of privilege and always discoverable. *But see Elliott v. Webb,* 98 F.R.D. 293 (D.Idaho 1983) (suggesting that "factual information" and "police investigative files" relating to closed cases are simply outside the scope of the privilege and entitled to no protection). While it may make sense to develop presumptions about the likely relative importance of preserving the confidentiality of certain commonly recurring categories of information (presumptions that the government could overcome by persuasive case-specific showings), it would needlessly threaten legitimate governmental concerns (and/or the privacy interests of officers or citizens) to refuse to extend any level of protection to certain kinds of information simply because of the abstract category in which it falls.

Courts that seem to have endorsed the latter view have failed to appreciate that doctrine in this area has involved two separate analytical balancings.[3] The *first* con-

---

3. The court in *Elliott v. Webb,* 98 F.R.D. 293 (D.Idaho 1983) seemed to use just one general policy balancing en route to deciding that *all* factual material in police files is discoverable by

a civil rights plaintiff and that *no* evaluative or opinion material in such files is discoverable. Proceeding at this level of generality is not appropriate unless the government fails to make

sists of balancing, at a general level, competing policies and categories of interests in order *to decide what kind of test to employ* when determining whether to sustain assertions of the official information privilege. As a result of that first, general level balancing analysis, most courts concluded that *the test* they should use to resolve specific disputes about the official information privilege *is a case by case balancing whose objective is to determine what weight each relevant consideration deserves in the fact-specific situation that is before the court.* See, e.g., *United States v. 30 Jars More or Less, of "Ahead Hair Restorer for New Hair Growth",* 43 F.R.D. 181 (D.Del.1967). To apply the test properly courts cannot defer completely to abstract generalizations (unless, as I discuss *infra.,* the government fails to offer competent evidence about how the specific requested disclosure would harm governmental interests). If the government makes the equivalent of a *prima facie* showing of harm, courts must conduct a situation specific analysis of the factors made relevant by the request in issue and the objection to it. This requirement does not preclude courts from developing presumptions about the likely relative weights of certain kinds of information, but it does mean that any such presumptions must be rebuttable and that courts have a duty to conduct an independent analysis whenever the government launches such a rebuttal effort.

### CONDUCTING ANALYSIS THROUGH THE WEIGHTED BALANCING TEST

Before turning to the specific documents in issue in this case the court should add some general comments about how the balancing test should be applied. The most complete list of factors to consider in this process was generated by Judge Becker in his oft-cited opinion in *Frankenhauser v. Rizzo,* 59 F.R.D. 339 (E.D.Pa.1973). That list, which is not exhaustive, includes the following:

> the equivalent of a *prima facie* showing that disclosure, in the specific situation confronted,

(1) The extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information.

(2) The impact upon persons who have given information of having their identities disclosed.

(3) The degree to which government self-evaluation and consequent program improvement will be chilled by disclosure.

(4) Whether the information sought is factual data or evaluative summary.

(5) Whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question.

(6) Whether the police investigation has been completed.

(7) Whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation.

(8) Whether the plaintiff's suit is non-frivolous and brought in good faith.

(9) Whether the information sought is available through other discovery or from other sources.

(10) The importance of the information sought to the plaintiff's case.

While courts must decide on a case by case basis, looking at the specific circumstances before them, how much weight to ascribe to each of these factors, it will be helpful to comment on how some courts have treated some of the considerations listed by Judge Becker.

Some courts have stated expressly that the tenth factor, "the importance of the information sought to the plaintiff's case," is clearly the most important. *E.g., Crawford v. Dominic,* 469 F.Supp. 260, 263 (E.D.Pa.1979) [citing *Culp v. Devlin,* 78 F.R.D. 136, 139–41 (E.D.Pa.1978)]. This view finds support in the policies that inform civil rights law and in the importance of doing justice in individual cases. Nonetheless, if taken too far this approach

> would threaten serious harm to significant interests.

would eviscerate the whole concept of balancing. In fact, courts that give essentially dispositive power to this one consideration make meaningless the idea that there is any "privilege" for official information. They reduce analysis of privilege disputes to assessments of degrees of relevance. While the tenth *Frankenhauser* factor is rightfully a full and weighty one, courts that make it dispositive thoughtlessly create a risk of serious harm to important competing interests.

With commentary that cuts in the opposite direction, this is the appropriate juncture to discuss the likelihood of harm to significant governmental interests by disclosure of three of the categories of material that are involved in the case at bar: (1) evaluative comments, recommendations, or findings that appear in files generated by internal affairs investigations, (2) complaints by citizens against police officers, and (3) manuals and memoranda that show how officers are instructed to use force when making arrests.

Some courts have concluded that evaluative comments and opinions expressed by officers conducting internal affairs investigations should be protected by a privilege that is almost absolute. In so doing, these courts make a mockery of the whole concept of balancing by converting just one of the *Frankenhauser* factors (number 4) into a virtually dispositive consideration. *See, e.g., Elliott v. Webb*, 98 F.R.D. 293, 297 (D.Idaho 1983). Without making their reasoning completely clear, these courts seem to assume that there is a greater risk that officers doing this work would not express their views honestly if they knew their words might be used against individual officers or the police department by a civil rights plaintiff. *But see, e.g., Mercy v. County of Suffolk*, 93 F.R.D. 520, 522 (E.D.N.Y.1982) (rejecting the view that candor will be chilled by limited disclosure). This premise, coupled with the notion that it is important to preserve the vigor of disciplinary procedures within police departments, has led some courts to conclude either that a plaintiff never should be able to discover such material, *see, e.g., Kott v.*

*Perini*, 283 F.Supp. 1 (N.D.Ohio 1968) (recognizing an absolute privilege for police records in a habeas corpus action); *but see Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 n. 8 (E.D.Pa.1973) (declining to follow *Kott, supra* ), or, at the least, that the law should impose a huge burden on such a plaintiff, denying him access to this kind of material unless he can make an extraordinary showing of need and justification.

There are at least two problems with the reasoning that supports this view. One is that the premise that supports it (that investigating officers will be less forthright in expressing their opinions if there is a risk of disclosure) is empirically unsupported and very debatable. The other problem with this line of reasoning is that after it acknowledges the great importance of enforcing federal civil rights policies it *fails to articulate a reason* for deciding to ascribe less weight to that enforcement effort than to the unmeasured harm to government interests that might follow from disclosure of evaluative material in internal affairs files.

Since privileges operate in derogation of the truth finding process, and since the policies that inform federal civil rights statutes are profoundly important, courts should not use empirically unsupported and debatable assumptions to rationalize shifting a burden of justification away from the party asserting privilege (where the burden of justification classically rests) and on to a plaintiff who is attempting simultaneously to enforce his rights and policies that the people, speaking through Constitutional amendments and federal statutes, have elevated to the highest levels of priority.

Since no empirical study supports the contention that the possibility of disclosure would make officers· who participate (as respondents or as investigators) in internal affairs investigations less honest it is doubly important to examine the assumptions that underlie that contention. If we posit two alternatives, one in which there is no possibility of disclosure and one in which there is some possibility of disclosure to

litigants (protective orders can be used to prevent disclosure to the public generally), and ask which is most conducive to candor, strong arguments can be advanced that it is the alternative in which there is some possibility of disclosure. A police officer who knows that no one from outside the law enforcement community will scrutinize his statements or his investigatory work may not feel the same level of pressure to be honest and accurate as would his counterpart in a system where some disclosure was possible. An officer might expect that someone within his organization would be less exacting in reviewing his statements or reports than someone from the outside, especially if the person from the outside already has substantial information about the incident under investigation and has a strong motive to challenge the accuracy of the officer's memory or the reliability of his conclusions. We rely in our adversary system of justice on the fear of being challenged and exposed by an opponent to keep litigants and lawyers honest. Closer to home, there is little doubt that the greatest sources of discipline in judicial thinking are the fear of close scrutiny on appeal and the fact that judges are required to explain and justify their rulings, in public, to an audience half of which always is hostile. Fear of scrutiny by knowledgeable people motivated to be aggressive is likely to inspire police officers to conduct investigations and write reports that are less vulnerable to criticism, and the way to make them less vulnerable is to make them more thorough, more accurate and better reasoned. In short, officers will feel pressure to be honest and logical when they know that their statements and their work product will be subject to demanding analysis by people with knowledge of the events under investigation and considerable incentive to make sure that the truth comes out (i.e., a civil

rights plaintiff and her lawyer). Thus there is a real possibility that officers working in closed systems will feel less pressure to be honest than officers who know that they may be forced to defend what they say and report.[4]

There is another vantage from which to think about the contention that officers who fear disclosure of their statements or reports will be less honest than those who entertain no such fear. An officer who is being interviewed during an internal investigation, or who is conducting such a probe, knows that what he says or writes could lead to criminal prosecution of other officers or to their termination from the force. *E.g., Wood v. Breier*, 54 F.R.D. 7, 13 (E.D. Wis.1972). That knowledge could be a considerable source of pressure to try to minimize any possible transgressions. In fact, pressure to "cover up" is likely to be much more intense from these sources than from the possibility that reports might be used in civil litigation, a process which, at the worst, might result in a judgment that the defendant officers would have no resources to pay (or that would be paid for them by insurance or their employer). Thus the possibility of disclosure to a civil litigant probably adds almost nothing to the pressure to dissemble that officers already would feel; those who are going to lie are going to do so regardless of whether there is some chance of disclosure to a citizen complainant.

To summarize, since there is no empirical support for the contention that the possibility of disclosure would reduce the candor of officers who contribute to internal affairs investigations, and since there are solid reasons to believe that that possibility might have the opposite effect (improving accuracy and honesty), there is no justification for offering near absolute protection

---

**4.** As Judge Pratt stated in *Mercy v. County of Suffolk*, 93 F.R.D. 520 (E.D.N.Y.1982):

No legitimate purpose is served by conducting the investigations under a veil of near total secrecy. Rather, knowledge that a limited number of persons, as well as a state or federal court may examine the file in the event of civil litigation may serve to insure that these investigations are carried out in an evenhanded fashion, that the statements are carefully and accurately taken, and that the true facts come to light, whether they reflect favorably on the individual police officers involved or on the department as a whole.
*Id,* at 522.

to the statements that go into such reports or to the opinions and recommendations that conclude them. In fact, for reasons to be developed below, such material should be presumptively discoverable when a plaintiff makes a proper showing of relevance.

There is even less reason to believe that the possibility of disclosure to civil rights plaintiffs will discourage citizens from filing complaints against police officers. It is not at all clear that people who feel aggrieved by actions of police officers would even think about the possibility that their complaints might be disclosed to another person who feels aggrieved by police officers. And if they did think about it they presumably would want their complaint to help someone who had suffered from a similar source. A citizen who complains about police misconduct simply is not in the same position as a confidential informant or a citizen who offers information that is potentially damaging to another citizen. The obvious reasons people in the latter categories have for wanting to protect their anonymity simply have no bearing on the behavior of citizens who file complaints against the police themselves. It follows that, in the absence of special circumstances proved by law enforcement defendants, courts should ascribe little weight to a police department's purported interest in preserving the anonymity of citizen complainants. *See, e.g., Frankenhauser v. Rizzo,* 59 F.R.D. 339, 344 (E.D.Pa.1973).

A third category of material that is involved in the case at bar consists of manuals, memoranda, and other documents that reflect the policies the police department has established for the use of force in connection with making arrests and that show how officers are trained with respect to the use of force in such settings. A police department's interest in not permitting *the general public* to have access to such materials may be weighty. Legitimate law enforcement efforts could be frustrated, and the lives of officers could be endangered, if anyone who wanted to could learn details about how officers are trained to accomplish their missions in specific situations. The weight of law enforcement's interest drops dramatically, however, when a court imposes a tightly drawn protective order on the disclosure of such material, so that only counsel for plaintiff, and perhaps his expert, has access to it. *See, e.g.,* Judge Pratt's STANDING ORDER, *Mercy v. County of Suffolk,* 93 F.R.D. 520, 524 (E.D.N.Y.1982). Such protective orders commonly provide, in addition, that the material may be used only in connection with the litigation at hand, that only one copy of each affected document may be made, and that every such copy must be returned to the police at the end of the case. Absent a special showing in a particular case, these kinds of measures usually will offer sufficient protection to the governmental interest.

Comments on two of the other factors in the *Frankenhauser* list are in order here. Factor number eight is "whether the plaintiff's suit is non-frivolous and brought in good faith." Courts working with this factor must walk a narrow line between dangerous alternatives. As a general proposition it may be true that the more evidence a particular plaintiff can adduce in support of his claim the more weight courts should ascribe to his interest in penetrating the official information privilege. *See Dellums v. Powell,* 561 F.2d 242, 245–47 (D.C. Cir.1977), *cert. denied,* 434 U.S. 880, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977). On the other hand, courts obviously must be careful not to pre-judge the merits of claims whose strength may be demonstrable only after the very discovery that is in issue. Given the elusiveness of proof of some kinds of civil rights claims (especially those that turn on proof that defendants acted with improper motives or an evil heart), and the importance of the policies that inform civil rights laws, it is especially important that judges give plaintiffs in these matters a fully reasonable opportunity to develop evidence in support of their claims. Doubts must be resolved, at the discovery stage, in favor of the claimant.

Courts also must beware, however, of permitting frivolous claimants to harass

law enforcement agencies with burdensome discovery into sensitive material. To reduce the odds of discovery being so abused, courts that have a solid reason for suspecting that a claim is frivolous might ask plaintiffs to use other means to develop information before ruling on an assertion of this privilege. In considering that option, however, courts must be mindful of the possibility that the most efficient means of case development would be through early discovery of the materials in police files. The more information available to a plaintiff before he commences taking depositions and sending out interrogatories, the more focused his questions can be. By plaintiffs being able to avoid a shotgun style approach in his questions, both parties may be saved substantial amounts of time and money. Moreover, access to police files could persuade a plaintiff that some depositions need not be taken at all.[5]

Another factor courts must consider is the public (and the court's) interest in the settlement of cases without lengthy and costly litigation. Disclosure of material contained in police files early in the discovery stage may encourage settlement of cases by helping plaintiffs determine whether a particular incident is indicative of departmental policy. In fact, disclosing material in police files early in the pretrial period could persuade plaintiffs to drop the suit, or at least to reduce significantly its scope (e.g., by dismissing certain defendants or abandoning certain causes of action).

The ninth factor in the *Frankenhauser* list is "whether the information sought is available through other discovery or from other sources." One key to fair consideration of this factor may reside in where courts place the burden of persuasion on this question. It is difficult to imagine how

plaintiffs, who generally will not know what is in confidential police files, could satisfy a court who demanded that they prove the negative, i.e., that there were no practicable alternative routes to the same information. Moreover, since information in police files often will have been developed closer in time to the subject events, when witnesses were around and their memories were fresher, and when the physical evidence was more accessible, in many cases it will not be likely that information of *comparable quality* will be available from any source. *E.g., Urseth v. City of Dayton*, 110 F.R.D. 245, 254 (S.D.Ohio 1986) [citing *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 345 (E.D.Pa.1973) and *Dos Santos v. O'Neill*, 62 F.R.D. 448, 451 (E.D. Pa.1974)]. For all of these reasons, it is appropriate to place the burden of persuasion on this factor on the party asserting the privilege. Thus, if the government cannot show that information of *comparable quality* is *as efficiently* available from alternative sources, this factor should be weighed in favor of disclosure. There also is authority for the view that the stronger the plaintiff's showing about the potential importance of the information to his case the greater the burden of persuasion the courts should impose on defendants with regard to this factor. *Cf. Burka v. New York City Transit Authority*, 110 F.R.D. 660, 666–67 (S.D.N.Y.1986).

Courts faced with arguments about the relevance of material as to which the official information privilege is asserted face a somewhat similar dilemma. While it is generally true that the party seeking to compel discovery has the burden of showing that his request satisfies the relevance standard of Rule 26 ("reasonably calculated to lead to the discovery of admissible evidence"), plaintiffs who do not know what is in police files may have difficulty if

---

**5.** The court in *Mercy* reasoned:

The internal affairs file is prepared at public expense, for a public purpose.... [i]ts availability pursuant to the court's discovery order enables a plaintiff, in the early stages of litigation, to identify the proper defendants as well as the circumstances surrounding the incident

without costly discovery. In short, disclosure of the file uniquely serves the major objective of all the Federal Rules of Civil Procedure, "to secure the just, speedy, and inexpensive determination of every action". FRCP, Rule 1. *Mercy v. County of Suffolk*, 93 F.R.D. 520, 523.

courts impose demanding standards on them. Perhaps it should be sufficient for a plaintiff to show how information of the *kind* that is likely to be in the files could lead to admissible evidence. It does not seem fair, as the court did in *Elliott v. Webb*, 98 F.R.D. 293 (D.Idaho 1983), to demand that a plaintiff identify with particularity the information that is in confidential police files and demonstrate specifically how that information is relevant to his claims. During *in camera* reviews, a judge should resolve doubts about relevance in favor of disclosure, in part because she is not likely to understand the case as well as plaintiff's counsel, and thus is not likely to be able to foresee all the ways he might be able to use the information, and in part because the standard set forth in Rule 26 is so broad.

## THE PROCEDURE FOR INVOKING THE OFFICIAL INFORMATION PRIVILEGE

Many of the courts that have developed doctrine about the executive or governmental privilege have drawn on cases involving the "state secrets" privilege for procedural guidelines. *See, e.g., Kerr v. U.S.D.C., supra*, 511 F.2d 192, 198 (9th Cir.1975) (applying the procedure for invoking the state secret privilege set out in *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) to a case involving prison staff personnel files and a claim of government privilege). The difficulty with looking to the state secrets cases is that because that privilege is essentially absolute, courts have felt the need to make the procedures for invoking it extremely demanding. Moreover, in the state secrets cases courts have been reluctant to conduct *in camera* inspections (fearing that forcing the government to expose such sensitive matter even to judges might compromise national security interests). *See, e.g., United States v. Reynolds*, 345 U.S. 1, 10, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953). But in the absence of *in camera* inspections, which could serve as important checks on knee-jerk or overbroad assertions of the privilege, it became essential that a very high level public official examine the documents in question and make an independent determination that their disclosure would threaten truly important national interests.

■ The environment is quite different for a court that confronts a police department's invocation of the "official information" privilege to try to protect confidential information in its files. Unlike its "state secrets" counterpart, the "official information" privilege is not absolute. *See generally In re "Agent Orange" Product Liability Litigation*, 97 F.R.D. 427 (E.D.N.Y. 1983). Since the official information privilege is not absolute, the effect of a procedurally correct invocation of it is not as dramatic and final. A defendant cannot terminate the judicial role and erect an impenetrable wall around confidential material simply by following correct procedures when lodging its objection. In fact, the weighted balancing test for resolving disputes about the official information privilege assures that it is the court, and not the holder of the documents, that has the ultimate power to decide whether there will be disclosure. Moreover, the considerations that inspired judges' reluctance to conduct *in camera* reviews in the state secrets cases simply do not apply when a police department invokes the official information privilege. The fact that courts routinely conduct such reviews in civil rights cases adds another layer of protection against potential abuses of privilege doctrine. *See Kerr v. U.S.D.C., supra*, 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (stating that *in camera* review is the appropriate way to deal with a claim of executive privilege). Because the judicial system and plaintiffs are not as vulnerable when the official information privilege is properly invoked there is less need to make the procedure for its invocation extremely demanding. In particular, courts can afford to relax the requirement, first developed in state secrets cases, that only "the head of the department that has control over the matter" may invoke the privilege. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). For reasons

explained *infra*, I do not believe that a lawyer representing governmental defendants should be permitted to invoke the official information privilege, despite the recommendations in *Proposed Fed.R.Evid. 509*, 56 F.R.D. 183 (1972).

■ There are, however, persuasive reasons for continuing to require litigants who would invoke this privilege to make a substantial threshold showing. One such reason is that, unlike "state secrets", the official information privilege is potentially extremely broad. Because so many different kinds of information could fall within the reach of this privilege there is a greater risk that it will be frequently and "lightly" invoked. Frequent and "light" invocations of this or any other privilege threaten both the integrity of the truth finding process and the resources of judges and plaintiffs.

The second and independently sufficient reason for requiring a substantial threshold showing by those who would invoke this privilege arises out of what the courts need in order to resolve disputes in this area. Courts are required to conduct case-by-case, situation specific analyses of competing interests (balancing) to determine whether to order disclosure of material that falls within the definitional reach of this privilege. That kind of analysis is impossible unless the party invoking the privilege provides the court with *specific* information about how disclosure of the subject material, in the situation presented by the case at hand, would harm significant law enforcement or privacy interests. Unless the government, through competent declarations, shows the court *what interests* would be harmed, *how* disclosure under a protective order would cause the harm, and *how much* harm there would be, the court cannot conduct a meaningful balancing analysis. And because the burden of justification must be placed on the party invoking the privilege, a court that cannot conduct a meaningful balancing analysis because the government has not provided the necessary information would have no choice but to order disclosure.

■ Taking all the relevant considerations into account, it is appropriate to impose the following procedural requirements on a party who seeks to invoke the qualified official information privilege. A party that receives a discovery request that would reach material that it believes is covered by the official information privilege must, within the time permitted by rule to respond or object, serve and file an objection that invokes the official information privilege by name. The party must set forth this objection separately in response to each discovery question or request that would reach material covered by the privilege.

■ To properly support each such objection the party also must submit, at the time it files and serves its response to the discovery request, a declaration or affidavit, under oath and penalty of perjury, from a responsible official within the agency who has personal knowledge of the principal matters to be attested to in the affidavit or declaration. That responsible official need not be the "head of the department which has control over the matter"; it need not be the chief of police or her equivalent. It would suffice, for example, for the affidavit to be provided by the head of the internal affairs unit, or by a person with some relevant supervisorial or policy making role. It will not suffice, however, to have the affidavit submitted by a person who authored documents that are in issue and that were generated in response to specific events related to the litigation (as opposed to the author of manuals or memoranda of general application).

Nor will an affidavit from the lawyer representing the agency or officers in the litigation suffice. It is essential that the affidavit come from an official in the affected agency. There are two reasons for this. One is that the affiant must have personal knowledge of the principal matters covered by the affidavit. The requirement of personal knowledge is not born of obeisance to mere formalism; it is important because the most reliable information will come from people with direct knowl-

edge about what interests are threatened by a particular disclosure and how much harm to those interests is likely. The other reason for requiring that the affidavit come from an official in the affected agency is that one objective of the procedure set forth here is to assure direct involvement by such officials in decisions about whether to invoke this privilege. That direct involvement is important for two reasons. It educates agency personnel about the *competing* interests and public policies that assertion of this privilege implicates. Moreover, that direct involvement enables agencies to develop consistent policies and practices relating to the circumstances under which they will assert the privilege and the manner in which they will do so.

▇▇▇ The affidavit or declaration from the agency official must include: (1) an affirmation that the agency generated or collected the material in issue and has in fact maintained its confidentiality (if the agency has shared some or all of the material with other governmental agencies it must disclose their identity and describe the circumstances surrounding the disclosure, including steps taken to assure preservation of the confidentiality of the material), (2) a statement that the official has personally reviewed the material in question, (3) a specific identification of the governmental or privacy interests that would be threatened by disclosure of the material to plaintiff and/or his lawyer, (4) a description of how disclosure subject to a carefully crafted protective order would create a substantial risk of harm to significant governmental or privacy interests, (5) and a projection of how much harm would be done to the threatened interests if the disclosure were made.

While not essential to proper invocation of the privilege, the agency's affidavit will contribute more to its goal of protecting the documents in question if the affidavit also describes how plaintiff could acquire, without undue economic burden, information of equivalent value from other sources. If counsel, rather than the affiant, is the more appropriate source of such information it may be set forth in a simultaneously submitted memorandum signed by the lawyer.

It is important to emphasize here that a principal reason for imposing these requirements is to provide the court with the information it needs to make a reasoned assessment of the weight of the interests that line up, in the particular situation before the court, against the requested disclosure. The more specific the government's affidavit, the better it equips the court to do its job. Another reason to require a situation specific affidavit is to provide the plaintiff with a fair opportunity to challenge the bases for the assertion of the privilege. Providing that opportunity is important to the court as well because in our adversary system the court looks to opposing parties to help it probe and measure the strength of submissions such as these.

▇▇▇ An agency that invokes the official information privilege should *not* submit the material in issue for *in camera* inspection at the same time it serves and files its response (objection) and supporting affidavit. The filing of the objection and affidavit shifts the burden of going forward with the process (but *not* the burden of persuasion on the underlying issue) to the plaintiff. On receipt of the objection and affidavit plaintiff is required to make a good faith determination as to whether the asserted privilege should be honored. If plaintiff believes that a dispassionate balancing of the competing interests clearly would lead to sustaining the assertion of the privilege (as presumably would be the case if the information sought is only of marginal utility and is readily accessible through alternative means), plaintiff should take no further action in pursuit of the material.

▇▇▇ If, on the other hand, plaintiff concludes that the assertion of privilege should not be sustained (as to some or all of the material), he must confer (in writing or orally, perhaps by telephone) with counsel for the agency, explaining the bases for his conclusion and trying to persuade the agency to change its position (again, with

respect to some or all of the materials). Only if that direct effort at persuasion fails should plaintiff turn to the court by filing a focused motion to compel. Plaintiff's motion should be accompanied by a memorandum and, if appropriate, an affidavit, (1) describing how, in the particular situation at bar, the requested information is relevant to the litigation or is reasonably calculated to lead to the discovery of admissible evidence, (2) identifying interests of plaintiff's that would be harmed if the material were not disclosed, and (3) specifying how that harm would occur and how extensive it would be. Although not required, plaintiff's submissions would be more effective if they also discussed why it would be impossible or impracticable to acquire information of equivalent value through alternative means.

After plaintiff's motion is filed and served the court will review the parties' initial submissions (including, of course, the affidavit and any other documents defendant filed in connection with its objection and assertion of privilege). If the court concludes, based on this review, that defendant's submissions are not sufficient to meet its threshold burdens, the court will order disclosure of the material. If the court concludes that defendant's submissions meet the threshold requirements for proper invocation of this privilege the court will order an *in camera* review and offer defendant an opportunity to submit a brief and additional supporting material (e.g., a supplemental affidavit). After offering plaintiff an opportunity to reply to defendant's submissions, and after considering everything pertinent to the dispute, the court will enter its ruling.

## APPLICATION OF THE PRINCIPLES DESCRIBED ABOVE TO THE DOCUMENTS IN DISPUTE HERE

This court considered some of the categories of documents at issue in this case in an earlier proceeding. In its ORDER of January 14, 1987, the court reached the conclusions reflected in the first three of the following paragraphs.

Because defendant confirmed that all files pertaining to plaintiff's arrest already had been produced, no further production of investigative files generated by the incident was required of the defendant.

Plaintiff's request for reports of injuries suffered by other persons while being arrested by the defendants was denied because a search for these documents would be extremely burdensome and because any incident of consequence that had occurred was likely to be reflected in other documents that were submitted to the court for *in camera* review.

Defendants asserted that disclosure of training manuals and material pertaining to the use of force in making an arrest would endanger their officers and the public. While this is certainly an interest that deserves respect, it would be seriously threatened only by disclosure to the general public. The interests of both parties can be served by carefully limited disclosure. The court has ordered disclosure only of material relating to the use of a baton (the instrument used in plaintiff's arrest) and use of bodily force in making an arrest. The court also has imposed a Protective Order under which only lawyers and their consultants and staffs may view this material and that compels counsel for plaintiff to destroy, at the conclusion of this matter, all material defendant has designated "confidential."

■ Because this opinion has articulated new procedures and has synthesized principles of law drawn from a wide range of sources it is understandable that defendant's submissions did not fully address all the matters that it is now clear the court would consider in resolving issues like those discussed in the next few paragraphs. Two consequences ensue. One is that the analysis presented in the next few paragraphs is not as thorough as it would be had defendant's had the benefit of this opinion before they formulated their submissions. The second consequence is that the court must give defendants an opportunity to make supplemental submissions. Thus, if defendants would like the court to

consider additional information, they shall submit briefs and declarations by no later than March 9, 1987. Plaintiffs shall reply by March 18, 1987. At that juncture the court will deem the matter submitted.

If defendants make no supplemental submissions the rulings reflected in the paragraphs that follow shall be entered as ORDERS of this court on March 9, 1987.

The citizen complaints against defendant officers and the internal affairs investigative files generated by those complaints were submitted for *in camera* review pursuant to an earlier order. "Administrative complaints" against the officers were also to be submitted but none were produced, apparently because no such complaints have ever been registered against the defendants.

Chief of Police Joseph D. McNamara, in his affidavit, claims the government privilege on the grounds of "public interest" and because he believes that without assurances of confidentiality officers will refuse to cooperate with Internal Affairs investigations. As has been emphasized in this opinion, a general claim of harm to the "public interest" is insufficient to overcome the burden placed on the party seeking to shield material from disclosure. In order to overcome the moderately weighted presumption in favor of disclosure the party claiming the official information privilege must, at least, specifically describe how disclosure under a carefully tailored protective order would substantially harm a significant governmental interest and state how much harm would be done to those threatened interests by disclosure in this particular case.

For similar reasons, defendants cannot meet their burden simply by asserting, without empirical support, that officers will refuse to cooperate with Internal Affairs investigations if their statements are subject to even limited disclosure. This is particularly true in the case at bar because San Jose police officers are subject to dismissal if they refuse to answer questions relating to the performance of their duties.

The court is further inclined towards disclosure in this case because, after reviewing the documents *in camera*, there is some reason to believe that after seeing this material plaintiff might decide against expending the time and expense of deposing the parties involved in these citizen complaints. In fact, there is some possibility that access to these documents might help persuade plaintiff to seek an early settlement of this matter.

For the reasons articulated above, the court hereby ORDERS defendants, by March 9, 1987, either to disclose to plaintiffs, pursuant to the protective order in effect in this case, the materials submitted for *in camera* review, or to submit additional declarations and briefs directed toward attempting to satisfy the court that the interests and policies favoring disclosure are clearly outweighed, in this particular case, by a specific, demonstrable, and substantial threat to an important governmental interest.

IT IS SO ORDERED.