**METRO WASTEWATER RECLAMATION DISTRICT, formerly known as Metropolitan Denver Sewage Disposal District No. 1, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, et al., Defendants.**

**CITY OF LAKEWOOD, Plaintiff,**

v.

**UNITED STATES FIRE INSURANCE COMPANY, et al., Defendants.**

Civ. A. Nos. 89–C–895, 90–2–880.

United States District Court, D. Colorado.

Jan. 23, 1992.

Order Filed March 18, 1992.

Richard P. Brentlinger, Joel A. Moritz, Denver, Colo. for Metro Wastewater Reclamation Dist.

Thomas L. Roberts, JoAnne M. Zboyan, Englewood, Colo. for Hartford Accident Indemnity Co.

Frederick J. Baumann, Mark Spitalnik, Denver, Colo. for Westchester Fire Ins. Co., United States Fire Ins. Co.

Robert M. Peterson, Ira D. Goldberg, San Francisco, Cal. for Continental Cas. Co., National Fire Ins. Co. of Hartford.

Peter R. Nadel, Laura J. Nagle, Denver, Colo. for City of Lakewood.

Frederick J. Baumann, JoAnn L. Vogt, Denver, Colo.

Michael L. O'Donnell, Robert R. Carlson, Denver, Colo. for Continental Cas. Co., National Fire Ins. Co. of Hartford.

F. Michael Ludwig, Eugene S. Hames, Denver, Colo. for Fireman's Fund Ins. Co.

Daniel Bartoldus, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y. for Fireman's Fund Ins. Co.

Scott F. Sullan, Ronald M. Sandgrund, Englewood, Colo. for U.S. Fidelity and Guaranty Co.

## MEMORANDUM OPINION AND ORDER [1]

PRINGLE, United States Magistrate Judge.

### I. INTRODUCTION

In case No. 89-C-895, Metro Wastewater Reclamation District (hereinafter "Metro")

---

1. Civil Action No. 89-C-895 and 90-Z-880 have not been consolidated pursuant to Fed.R.Civ.P. 42. However, both cases have been referred to me for purposes of ruling on discovery motions.

seeks 1) a declaratory judgment that certain insurance carriers have an obligation to defend proceedings initiated by the United States Environmental Protection Agency (hereinafter, "EPA") and to pay "damages" for which Metro may be liable; 2) a decree of specific performance; and 3) reimbursement for costs and expenses already incurred. Basically, the same claims have been made by the City of Lakewood (hereinafter "Lakewood") against various insurance carriers in case No. 90–Z–880.[2] The matter is before the Court on the Motions of the defendants in both cases to compel production of documents and disclosure of information regarding the agreements between the plaintiffs and other entities involved in the EPA proceedings. The Motions also seek disclosure of documents and information concerning (a) the activities of attorneys and consultants for the plaintiffs and the Lowry Coalition in connection with the EPA proceedings; and (b) correspondence of plaintiffs and the Lowry Coalition with their respective legal counsel and advisors concerning the Lowry Landfill and Lowry Bombing Range, and the EPA proceedings. The plaintiffs have declined to produce or provide the documents and information, asserting that they are protected by the attorney-client privilege, the immunity provided to work product, and the joint defense privilege. In addition, the Lowry Coalition has objected to the disclosure, claiming that it has an interest in maintaining the confidentiality of the requested documents and information.[3]

Metro is involved in the processing of raw sewage.[4] From the late 1960's until the early 1980's, Metro's processed sewage sludge was incorporated into the soils of the Lowry Bombing Range and around the perimeter of the Lowry Landfill. Similarly, from 1977 through 1980, the City of Lakewood and its predecessors processed raw sewage and delivered the sludge to the Lowry Landfill.

In 1988, the EPA notified Metro, Lakewood, and many other entities that they might be potentially responsible parties ("PRP's") for the clean-up of alleged contamination at the Lowry Landfill Superfund Site (the "Landfill"). These notifications were pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA" and "SARA," respectively). In essence, the EPA contends that allegedly hazardous substances and leachate from processed sewage sludge has infiltrated into the substratum beneath the Landfill, contaminating shallow groundwater and subsurface liquids.

In June of 1988, the PRP's, including Metro and Lakewood, received Special Notice Letters from the EPA, informing them that they had been designated to perform and finance a Remedial Investigation and Feasibility Study ("RI/FS") for the Shallow Groundwater and Subsurface Liquids Operable Unit ("OU") at the Landfill. Thereafter, several of the PRP's negotiated an administrative Consent Order with EPA, in which they agreed to perform certain studies relating to the Landfill. These PRP's formed an organization known as the Low-

---

The Motions to Compel filed by the defendants in these cases raise virtually identical issues and, as a result, a joint hearing was held at which counsel for all parties in both actions, as well as the Lowry Coalition, were given an opportunity to be heard. Because the issues presented are the same, judicial economy dictates that the Motions to Compel in both cases be resolved in one Memorandum Opinion and Order.

2. The defendants include both primary and excess carriers. For purposes of the pending Motions to Compel, there is no need to distinguish between them, since the same principles apply to both.

3. The Coalition filed Motions to Intervene, for Protective Order, or for Leave to Appear as Amicus in both 89–C–895 and 90–Z–880. Judge Weinshienk denied the Motion to Intervene in 90–Z–880, and, for purposes of consistency, I denied the Motion to Intervene in 89–C–895. However, I did grant the Coalition's request to appear as amicus in both cases.

4. The facts outlined herein were taken from the party's pleadings and do not appear to be in dispute.

ry Coalition (the "Coalition"), which coordinates, funds, and conducts the studies and activities required by the Consent Order. The authority of the Coalition, its structure, and the method for financing its work are spelled out in the Lowry Landfill Shallow Groundwater and Subsurface Liquids Operable Unit Agreement (the "Coalition Agreement"). Both Metro and Lakewood are members of the Coalition and signatories to the Coalition Agreement.

Metro and Lakewood made demands on their respective insurance carriers for defense and indemnification with respect to the EPA proceedings. The carriers rejected the demands, and these lawsuits followed. The defenses raised by the carriers involve the following issues: (a) whether the EPA activity is a "suit," within the meaning of the policies; (b) whether the costs being incurred by the plaintiffs are "damages" under the terms of the policy; (c) whether the alleged contamination constitutes an "occurrence,"; (d) whether the pollution exclusion contained in the policies applies to preclude coverage; (e) the timing of the plaintiffs' placement of sludge at or near the Landfill; (f) the timing of alleged contamination of the shallow groundwater and subsurface liquids; (g) assuming coverage, what portion of the amounts expended in connection with the EPA activity should be covered under the insurers' obligations to provide defense, and what portion under to the insurers' obligations to provide indemnity for damages; and (h) the reasonableness of the costs and expenses incurred by the plaintiffs.

## II. THE SUBJECT DOCUMENTS AND INFORMATION

Metro and Lakewood have refused to produce the Coalition Agreement, contending that it constitutes attorney work product and falls within the scope of the joint defense privilege. In addition, Metro has provided the defendants in 89–C–895 with a 300–page privilege log, identifying thousands of documents as being protected by the attorney-client privilege, the joint defense privilege, and/or the qualified immunity afforded to work product. These documents may be broken down into the following general categories:

1. Correspondence between attorneys and Metro or between consultants and Metro's attorneys relating to the Landfill;

2. Reports to Metro from its consultants and in-house memoranda relating to the Landfill and/or the EPA proceedings;

3. Correspondence between attorneys and the Coalition concerning the Coalition's activities;

4. Meeting notices, agendas, and minutes of meetings for the Coalition and its various committees;

5. Correspondence between technical advisors and consultants and the Coalition;

6. Reports and drafts of reports from technical advisors and consultants for the Coalition;

7. Invoices to the Coalition for legal and consulting services;

8. Coalition payment authorizations for legal and consulting services;

9. Drafts of amendments to the Coalition Agreement;

10. Agreements for providing technical services to the Coalition and Metro concerning the Landfill and EPA proceedings;

11. Correspondence between counsel and the Coalition or Metro regarding insurance coverage or the instant litigation with insurance carriers.

Although Lakewood has not, as yet, provided a privileged document log, the defendants in 90–Z–880 have unsuccessfully attempted to depose Richard Plastino, the Lakewood Director of Planning, Permits and Public Works, regarding the activities of the Coalition, and the activities of the City as a member thereof. Mr. Plastino declined to answer these questions, claiming that the information was confidential and privileged.

As to the documents within categories 1 and 2 above, the validity of Metro's position will be considered in section III, *infra.* The contentions of the plaintiffs and the Coalition with respect to the documents

and information in categories 3–10 will be considered in section IV, *infra*. The documents in category 11 will be discussed in section V, *infra*.

## III. METRO'S CLAIM OF ATTORNEY–CLIENT PRIVILEGE AND/OR WORK PRODUCT IMMUNITY (CATEGORY 1 AND 2 DOCUMENTS)

### A. *Attorney-client privilege*

■ Plaintiff Metro contends that correspondence with its counsel (category 1 above) is protected by the attorney-client privilege, and that no waiver of the privilege has occurred. Since federal jurisdiction in this case is premised on diversity of citizenship, Colorado law supplies the basis for any claim of privilege. *See* Fed.R.Evid. 501. Colo.R.Stat. § 13–90–107(1)(b) provides: "An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment." The attorney-client privilege not only precludes examination of a lawyer, but also prevents third-party access to any confidential matters communicated by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations. *People v. Tippett*, 733 P.2d 1183, 1192 (Colo.1987).

■ There is no doubt that Metro's correspondence with its counsel falls within the scope of the attorney-client privilege, and defendants in 89–C–895 do not contend otherwise. Thus, the documents in category 1 would be protected from disclosure if (a) production of these materials to the defendants in 89–C–895 would invade Metro's attorney-client privilege; and (b) the privilege has not been waived. I find and conclude both that disclosure of category 1 documents to the defendants in 89–C–895 would not constitute an invasion of Metro's confidential relationship with its counsel, and that any privilege with respect to these materials has been impliedly waived.

### 1. Common interest

■ It is well established that not every disclosure of attorney-client communications constitutes an invasion of the privilege. Communications shared with third persons who have a common legal interest with respect to the subject matter thereof will be deemed neither a breach nor a waiver of the confidentiality surrounding the attorney-client relationship. *E.g., Hodges, Grant & Kaufmann v. United States Gov't*, 768 F.2d 719, 721 (5th Cir.1985); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1174 (D.S.C.1974). This doctrine has been applied to preclude an insured's reliance on the attorney-client privilege to prevent discovery of documentation generated during an underlying lawsuit in a subsequent coverage dispute between the insured and its insurer. *Independent Petrochemical Corp. v. Aetna Casualty & Surety*, 654 F.Supp. 1334 (D.D.C.1986); *Truck Ins. Exch. v. St. Paul Fire & Marine Ins. Co.*, 66 F.R.D. 129 (E.D.Pa.1975); *Waste Mgmt., Inc. v. International Surplus Lines Ins. Co.*, 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322 (1991).

Here, Metro and the defendants in 89–C–895 have a common interest insofar as the facts and circumstances leading up to the EPA proceedings and the activities undertaken in response to the EPA proceedings are concerned. Until the present coverage controversy is resolved, by virtue of their contracts with Metro, the defendants continue to be potentially liable for all the costs, expenses, and/or damages arising from the EPA's action. Both Metro and its insurers had, and continue to have, precisely the same interests in (a) preventing further claims against Metro under CERLA and SARA, and (b) defeating or favorably resolving by settlement any such claims, whether asserted by the EPA or private parties. In short, the attorney-client privilege is designed to protect a client's expectation of confidentiality regarding communications with his attorney. *Geralnes B.V. v. Greenwood Village*, 609 F.Supp. 191 (D.Colo.1985). There has been no showing by Metro that, at the time the documents in question were generated, it had any intent or expectation that they would be concealed from its insurance carriers.

## 2. Waiver

■ The privilege may be waived by disclosing attorney-client communications to third persons who do not have a common interest with the holder of the privilege. *Denver Post Corp. v. University of Colo.*, 739 P.2d 874 (Colo.App.1987). In addition, a party impliedly waives the attorney-client privilege when he places a claim or defense at issue, and the document or information in question has a direct bearing on that claim or defense. *Mountain States Tel. & Tel. Co. v. Di Fede*, 780 P.2d 533 (Colo. 1989). *See also Potomac Elec. Power Co. v. California Union Ins. Co.*, 136 F.R.D. 1 (D.D.C.1990); *Charlotte Motor Speedway, Inc. v. International Ins. Co.*, 125 F.R.D. 127 (M.D.N.C.1989).

■ The coverage issues in 89–C–895 will require resolution of questions such as (a) whether Metro knew that its sludge contained hazardous substances, and, if so, the timing of such knowledge; and (b) the timing of any discharges of contaminated material at the Landfill.[5] Further, in the event that Metro prevails on the coverage issues, additional matters must be resolved, including (a) whether the costs and expenses incurred were reasonable; and (b) how the expenditures should be allocated as between defense costs and indemnity for damages. The documents sought by the defendants may well have a significant bearing on each of these questions.

### B. *Work product*

■ Fed.R.Civ.P. 26(b)(3) establishes the parameters of the work product doctrine and sets forth the showing which must be made to overcome the qualified immunity provided to materials falling within its scope. Generally, a party may discover documents and tangible things prepared in anticipation of trial by or for another party or by or for that other party's representative only upon a showing that (a) the party seeking discovery has a substantial need for the materials, and (b) the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. The burden of establishing that documents qualify as work product is upon the party seeking to prevent their disclosure. *Casson Constr. Co. v. Armco Steel Corp.*, 91 F.R.D. 376, 385 (D.Kan. 1980).

■ In order to come within the protection of Rule 26(b)(3), the documents in question must have been prepared in anticipation of litigation. Where litigation is not pending at the time the materials were generated, the party seeking protection must at least show that they were created in anticipation of an identifiable prospect of litigation. *In re September 1975 Grand Jury Term*, 532 F.2d 734 (10th Cir.1976). A few of the documents for which Metro claims protection under the work product doctrine were prepared long before the EPA proceedings commenced, and, in fact, were generated in the 1970's, prior to the enactment of CERCLA. No showing has been made by Metro that any of these pre–1980 materials were prepared in anticipation of litigation, and logic would clearly dictate otherwise.

■ Metro also has raised the work product doctrine as a bar to the production of in-house memoranda and correspondence or reports from its consultants that were generated after the EPA proceedings were commenced and the Consent Order was agreed upon.[6] I find and conclude that such documents relating to the EPA Consent Order cannot be deemed to have been prepared in connection with litigation or in

---

**5.** In *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo.1991), the Colorado Supreme Court held that, initially, the duty to defend must be determined from the allegations in the underlying complaint. Consequently, plaintiffs contend that the documents and information sought by the defendants have no relevance. While this may well be the case with respect to the issue of duty to defend, it is not true with respect to the plaintiffs' claims for indemnification. The right of the plaintiffs to reimbursement for defense costs and/or damages, as well as the amount thereof, is a question of fact. The subject documents and information are clearly relevant to these indemnification issues.

**6.** These materials generally fall within category 2, as identified in section II of this Opinion, *supra.*

**478**

anticipation thereof. While the documents' contents have not been identified, they appear to concern work being done to implement and comply with the Consent Order. Once a settlement was reached with the EPA, activities undertaken to comply with the settlement terms did not relate to existing or anticipated litigation. See section IV(A) of this Opinion, *infra.*

■■■■ Furthermore, the common interest doctrine discussed in section III(A)(1) of this Opinion, *supra,* applies with equal force to claims of work product. *American Standard, Inc. v. Bendix Corp.,* 71 F.R.D. 443 (W.D.Mo.1976); *Waste Mgmt. Inc. v. International Surplus Lines Ins. Co.,* 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322 (1991). The qualified immunity afforded to work product simply does not allow an insured to withhold documents from its insurer when those documents relate to underlying litigation for which the insured is seeking defense and/or indemnification. As stated by the Illinois Supreme Court in *Waste Management, supra:*

It is essential to note that, until there is a declaration to the contrary, insurers continue to bear potential responsibility for settlement and litigation costs in the underlying action. The underlying defense litigation documents were generated in anticipation of minimizing liability, an interest common to both insurers and insureds. As we have previously stated, these documents may enjoy privileged status as to party opponents in the underlying litigation, but they cannot be privileged from insurers who may bear the ultimate burden of payment. While the parties are now adverse concerning the issue of coverage, no such adversity exists as to the underlying litigation.

161 Ill.Dec. at 787–88, 579 N.E.2d at 335–36.

## IV. PLAINTIFFS' AND THE COALITION'S CLAIMS OF JOINT DEFENSE PRIVILEGE, ATTORNEY–CLIENT PRIVILEGE, AND WORK PRODUCT IMMUNITY (CATEGORY 3–10 DOCUMENTS)

### A. *Joint defense privilege*

■■■ The plaintiffs in both cases assert that essentially all documents and information generated by the Coalition, including the Coalition Agreement itself, are protected from disclosure by the joint defense privilege. Included are the materials falling within categories 3 through 10, above, as well as the questions directed to Mr. Plastino during his deposition.

While Colorado has yet to recognize the existence of a joint defense privilege, it has been widely accepted by courts throughout the United States. *John Morrell & Co. v. Local Union 304A,* 913 F.2d 544 (8th Cir. 1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1683, 114 L.Ed.2d 78 (1991); *In re Grand Jury Subpoenas,* 902 F.2d 244 (4th Cir. 1990); *United States v. Schwimmer,* 892 F.2d 237 (2d Cir.1989); *Waller v. Financial Corp. of America,* 828 F.2d 579 (9th Cir.1987); *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 805 F.2d 120 (3d Cir.1986); *Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 689 F.Supp. 841 (N.D.Ill.1988); *Western Fuels Ass'n Inc. v. Burlington N.R. Co.,* 102 F.R.D. 201 (D.Wyo.1984).

■■■■ The joint defense privilege preserves the confidentiality of communications and information exchanged between two or more parties and their counsel who are engaged in a joint defense effort. Waiver of the joint defense privilege requires the consent of all parties participating in the joint defense. *John Morrell & Co. v. Local Union 304A,* 913 F.2d 544 (8th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1683, 114 L.Ed.2d 78 (1991); *Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 689 F.Supp. 841 (N.D.Ill.1988). It must be noted that the joint defense privilege is merely an extension of the attorney-client privilege and the work-product doctrine. In other words, it confers no independent privileged status to documents or information. Thus, to be eligible for protection under the joint defense privilege, it must be established that the materials fall within the ambit of either the attorney-client privilege or the qualified immunity afforded to work product. *E.g., In re Grand Jury Subpoenas,* 902 F.2d 244 (4th Cir.1990);

*Schachar v. American Academy of Opthalmology, Inc.*, 106 F.R.D. 187 (N.D.Ill. 1985).

▇▇▇ Additionally, the timing of the communications is important. "The privilege arises out of the need for a common defense, as opposed merely to a common problem." *Medcom Holding Co. v. Baxter Travenol Lab., Inc.*, 689 F.Supp. 841 (N.D.Ill.1988). As a result, one relying on the joint defense privilege must establish that (a) there was existing litigation or a strong possibility of future litigation; and (b) the materials were provided for the purpose of mounting a common defense against it. *Medcom, supra; EEOC v. Peoples Gas, Light & Coke Co.*, No. 80–C–1824, 1981 WL 2332 (N.D.Ill. Aug. 19, 1981).[7]

The plaintiffs and the Coalition assert that all Coalition materials and activities, including the Coalition Agreement, are subject to an underlying attorney-client and/or work product privilege, and that they were prepared or undertaken in connection with a joint defense against the EPA proceedings. Consequently, they contend that much of the Coalition's activities and the documents generated pursuant thereto are protected by the joint defense privilege, which cannot be waived without the consent of all Coalition members.

For many of the same reasons as previously discussed in section III(b) of this Opinion, *supra*, I conclude that the Coalition activities do not constitute a joint defense to pending or future litigation. Basically, the Coalition Agreement and action taken thereunder are simply for the purpose of carrying out the work required by the EPA Consent Order. It is true that the Coalition members have expressly denied liability for any of the matters asserted in the Consent Order, and, therefore, the responsibility for any alleged contamination may well be the subject of future litigation. Nevertheless, the Coalition Agreement does not invest the Coalition with the power to jointly defend against future action which the EPA may take as a result of the RI/FS, nor does the scope of the Agreement reach the prosecution of claims for contribution or indemnity against third parties.[8]

▇▇▇ Even if the Coalition Agreement and the Coalition activities and documents are subject to a joint defense privilege, such a privilege would not shield them from discovery by the defendants. As previously noted in section III of this Opinion, *supra*, the plaintiffs share a common interest with their insurance carriers with respect to the EPA proceedings. Similarly, the Coalition, as the representative of the plaintiffs and others with regard to the EPA and the Consent Order, has a similar common interest with the plaintiffs' insurers. Indeed, the Coalition Agreement itself acknowledges this common interest and recognizes that the Agreement will benefit the members' carriers. I, therefore, find and conclude that, at the time the Coalition documents in question were prepared, there was no intent to exclude the members' carriers from access to them, and, hence, disclosure to the defendants will not

---

**7.** There are certain similarities between the common interest doctrine discussed in sections III and IV of this Opinion, and the joint defense privilege. Both permit one to supply documents and information to a party who has a common interest without waiving the attorney-client or work product privilege. The distinctions between the two doctrines relate to the timing of the disclosure and the ability thereafter to waive the privilege. The joint defense privilege arises only where the common interest of the parties relates to the joint defense of existing or impending litigation. Furthermore, if a document is subject to a joint defense privilege, a waiver of the privilege requires the consent of all parties involved in the joint defense.

*See Polycast Technology Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47 (S.D.N.Y.1989).

**8.** My holding that the activities of the Coalition do not constitute a joint defense to present or impending litigation should not be taken as an expression of any view as to whether the EPA designation of the plaintiffs as potentially responsible parties constituted the initiation of a "suit," within the meaning of the policies. This issue is currently before the Court on cross-motions for summary judgment in 89–C–895, and the case law reflects a divergence of opinion on the subject. *Compare Harter Corp. v. Home Indem. Co.*, 713 F.Supp. 231 (W.D.Mich. 1989) *with Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71 (E.D.Mich.1987).

invade the confidentiality of either the Coalition's relationship with its counsel or the qualified immunity afforded to work product.

■ I also find and conclude that the requirements for disclosure of work product, as set forth in Fed.R.Civ.P. 26(b)(3) have been met. The documents and information sought by the defendants in 89–C–895 and 90–Z–880 comprise the efforts of the Coalition to fulfill the requirements of the Consent Order. Under the Coalition Agreement, the cost of these efforts is borne by the members according to an established formula. Plaintiffs seek to recover their pro rata share of these very costs and expenses in this litigation. The reasonableness of the costs and expenses claimed cannot be assessed without information and documentation which identifies the work performed. Additionally, if coverage exists, plaintiffs' share of the Coalition expenses must be allocated between defense costs and reimbursement for damages.[9] This simply cannot be accomplished without an analysis of the work actually performed. As a result, the requisite necessity under Rule 26(b)(3) has been established. *See Waste Mgmt., Inc. v. International Surplus Lines*, 144 Ill.2d 178, 161 Ill.Dec. 774, 783, 579 N.E.2d 322, 331 (1991) ("Here ... insureds seek to have insurers pay for their defense counsel's services while at the same time claiming that the insurers have no right to examine counsel's files. We think that even the seemingly impenetrable work-product doctrine would not permit such unfairness and potential injustice.").

**9.** The allocation between defense costs and indemnity for damages is important because there is a quantitative lid on the carrier's exposure as to the latter, but no such lid as to the former. Thus, the matter of allocation has a significant impact on both the primary and excess carriers.

**10.** There is no doubt that defendants have made a sufficient showing of need and unavailability to require production of factual work product. A stronger showing is necessary to obtain mental impressions, conclusions, opinions, or legal theories of an attorney or other representative. The case law suggests that even opinion work product is discoverable where the requested documents bear directly on the claims or de-

■ A party may establish his inability to obtain equivalent materials through alternative means by showing that the information is within the exclusive control of the opposing party. 4 Moore's Federal Practice, ¶ 26.64[3.–1], at 26–365. I find that such a showing has been made. It is apparent that the Coalition documents and information which defendants seek only can be obtained from Coalition members, such as the plaintiffs. The Coalition Agreement contains strict confidentiality requirements. As a result, the details of the Coalition's activities are known only to its members, attorneys, and consultants.[10]

## V. CORRESPONDENCE BETWEEN COUNSEL AND THE COALITION OR METRO CONCERNING INSURANCE COVERAGE OR THE INSTANT LITIGATION WITH INSURANCE CARRIERS (CATEGORY 11 DOCUMENTS)

■ There remain several documents, consisting of correspondence between counsel and either Metro or the Coalition, that appear to concern the issue of insurance coverage or the present coverage litigation. These materials fall within the scope of the attorney-client privilege. Unlike information relating to the underlying EPA proceedings, there can be no claim that the insurers have a common interest in documents pertaining to the instant suits. Regarding coverage issues, the plaintiffs and the insurers are adversaries in the truest sense of the word. It would substantially undermine the adversary process to allow

fenses asserted. *E.g., Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926 (N.D.Cal.1976); *Bird v. Penn Cent. Co.*, 61 F.R.D. 43 (E.D.Pa. 1973). However, as I have noted in sections III and IV, the work product doctrine is inapplicable to these materials because they were not prepared in anticipation of litigation and common interests exist. *See Waste Management v. International Surplus Lines*, 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322 (1991). Consequently, even though some of the documents in question may contain opinions, mental impressions, and the like, there is no need for me to determine whether the stronger showing required by Rule 26(b)(3) for opinion work product has been met.

the carriers to discover communications to and from counsel which provide insight into the tactics and strategies which may be employed in the present cases. Based on the foregoing,

IT IS HEREBY ORDERED that defendants' Motions to Compel in 89–C–895 and 90–Z–880 are GRANTED with respect to the Coalition Agreement, the documents falling within categories 1–10, above, and the testimony of Mr. Plastino. The Agreement and documents in categories 1–10 shall be made available to the defendants for inspection and copying within 15 days from the date of this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that defendants' Motions to Compel are denied with respect to documents falling within category 11, above.

I find that because the issues presented by the Motions to Compel are complex, and some appear to be matters of first impression in this Circuit, opposition to the Motions was substantially justified. Consequently, the plaintiffs' requests for attorney fees and costs pursuant to Fed.R.Civ.P. 37(a)(4) are DENIED.

### ORDER

This matter comes before the Court on the Motion of Metro Wastewater Reclamation District in case 89–C–895 for reconsideration and modification of my Memorandum Opinion and Order of January 23, 1992; a similar Motion filed by the City of Lakewood in case 90–Z–880; and a Position Statement by the Lowry Coalition as Amicus. In essence, the Motions and the Position Statement voice objection to that portion of the Court's January 23, 1992 Memorandum Opinion and Order which concludes that the documents in categories 1–10 (as identified in the Memorandum Opinion and Order) are not covered by the work product immunity doctrine because they were not prepared in connection with pending or anticipated litigation.

In light of the matters raised in the Motions and Position Statement, the Court believes that the following modification and clarification of the January 23, 1992 Memo-

randum Opinion and Order would be appropriate. The Court's decision that the documents in question are not work product was based on the evidentiary record before the Court at the time the January 23, 1992 decision was rendered. As I stated in my Memorandum Opinion, the burden of establishing that documents qualify as work product is upon the party seeking to prevent their disclosure. In my opinion, the plaintiffs failed to present sufficient evidence to sustain their burden of proof on this issue. Indeed, no evidence was presented by the plaintiffs in support of their position and the Court did not conduct an *in camera* review of the documents identified on plaintiff Metro's privilege log. In the context of other litigation the plaintiffs may well be able to muster additional evidence which would sustain their burden of the proof on the work product issue, and the Court does not intend to preclude plaintiffs from attempting to make such a showing in other cases.

The Court has also determined that certain modifications of the standing Confidentiality Order should be made with respect to the documents in categories 1–10 as identified in the January 23, 1992 Memorandum Opinion and Order. These modifications will be the subject of a separate Order of the Court.

In all other respects, the plaintiffs' Motions for Reconsideration are denied.

