Brandi R. GRIFFITH, as the personal representative of the Estate of Mickey J. Smith, Ashley Nicole Griffith, a minor, by and through her Guardian Ad Litem, Brandi R. Griffith, Plaintiffs,

v.

Paul Hamilton DAVIS, et al., Defendants.

No. CV 94–4744–JSL (AJWx).

United States District Court,
C.D. California.

June 9, 1995.

V. James De Simone, Michael D. Seplow and Benjamin Schonbrun of Schonbrun & De Simone, Stephen Yagman, Marion R. Yagman of Yagman & Yagman, P.C., Venice, CA, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen. Civ. Div., Helene M. Goldberg, Director Torts Branch, Civ. Div., Stephen F. McGraw, Trial Atty., Torts Branch, Civ. Div., and Laura Radack, Trial Atty. Torts Branch, U.S. Dept. of Justice, Washington, DC, James R. Sullivan, Asst. U.S. Atty., Los Angeles, CA, for defendant U.S. of America.

James R. Asperger and Stan Blumenfeld of O'Melveny & Myers, Los Angeles, CA, for defendant Paul Hamilton Davis.

## MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTIONS FOR A PROTECTIVE ORDER

WISTRICH, United States Magistrate Judge.

### PROCEEDINGS

On April 21, 1995, defendant United States filed a motion for a protective order authorizing it to withhold from production to plaintiffs a memorandum prepared by Special Agent John Rabatin. On April 24, 1995, defendant Davis filed a similar motion for a protective order, based upon separate grounds. Plaintiffs filed an opposition to both motions on May 3, 1995. Defendant Davis filed a reply on May 12, 1995. The matter was heard on May 18, 1995. On May 19, 1995, the Court ordered defendants to produce the document at issue for possible *in camera* review. Defendant Davis submitted the memorandum on May 30, 1995, along with an objection to the possible *in camera* review. On June 5, 1995, plaintiffs filed a reply to defendant's objection.[1] On June 7,

---

1. In light of defendant Davis' objection, the Court did not examine the memorandum until

1995, defendant United States filed an *ex parte* application for leave to file the declaration of Agent Rabatin in support of its motion. Plaintiffs filed an opposition to the application on June 9, 1995. The application was granted on June 9, 1995.

## FACTS

On July 14, 1994, plaintiffs filed this action against defendant Special Agent Davis and other unnamed federal officers, alleging both common law and *Bivens* claims.[2] Plaintiffs' claims are based upon a July 16, 1993 incident, during which defendant Davis shot and killed plaintiffs' decedent. At the time of the incident, defendant Davis was employed by the Internal Revenue Service ("IRS"). After the incident, the IRS conducted an administrative investigation of the incident, in order to determine wither defendant Davis was guilty of misconduct. Special Agent Rabatin of the Regional Inspector's Office was assigned to conduct the investigation. [McGraw Decl. at 4; Rabatin Decl. at 3]. Although the record is unclear, the investigation evidently commenced as early as March, 1994.[3]

At some point after the incident, defendant Davis requested that the United States Attorney General certify that he was acting within the cope of his employment at the time of the incident. In October 1994, the Attorney General's designee determined that defendant Davis was acting within the scope of his employment pursuant to the Federal Tort Claims Act. [McGraw Decl. at 2]. On January 19, 1995, the United States filed a certification to that effect, and substituted itself as the defendant on the common law tort claims. Defendant Davis remains the sole defendant as to the *Bivens* claims.

Defendant Davis also requested that the United States Department of Justice provide him with legal representation. [Motion, Ex. A ("Davis Decl.") at 21]. As of the date of the hearing on the motions, that request was still pending.

Sometime in the fall of 1994, counsel for defendant Davis and counsel for the United States decided that defendant Davis and defendant United States had a common interest in defending the action, and agreed to pursue a joint defense. [Motion, Ex. B ("Blumenfeld Decl.") at 29; McGraw Decl. at 4]. The parameters of the agreement are hazy. The agreement was not written, and the date is described only as "[a]t least as early as October or November of 1994...." [Blumenfeld Decl. at 29]. It does not appear that the IRS itself was a party to the agreement. In accordance with that agreement, however, counsel for defendant Davis and the United States, among other things, prepared witnesses together, exchanged information about their separate interviews of various witnesses, and exchanged drafts of documents. [Blumenfeld Decl. at 29].

On December 7, 1994, counsel for the United States formally requested a litigation report from the IRS, the agency involved in the action. [McGraw Decl. at 2–3]. Counsel for the United States was informed that Agent Rabatin, who was already involved in conducting the administrative investigation of defendant Davis, would also conduct the investigation in support of the litigation. [McGraw Decl. at 2; Rabatin Decl. at 2–3].

On December 13, 1994, Agent Rabatin and another federal agent met with defendant Davis. Defendant Davis' counsel, James R. Asperger and Stan Blumenfeld also were present. [Blumenfeld Decl. at 30]. Stephen McGraw, counsel for the United States, did not participate in the meeting. Prior to that date, Mr. Blumenfeld and Mr. McGraw had discussed the meeting, and had agreed that

---

after it had concluded that defendants' motions should be denied. At that point, the Court considered the memorandum to determine whether there was anything about the document itself that would have led to a different conclusion, and whether there were any portions of the memorandum as to which the motions should be granted. The memorandum is entirely consistent with the Court's denial of the motions.

2. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

3. On March 17, 1994, Agent Rabatin contacted the Los Angeles County District Attorney's office seeking information regarding the shooting incident to be used in the administrative investigation of defendant Davis. [De Simone Decl., Ex. E at 15].

the interview of defendant Davis would be kept "confidential." [Blumenfeld Decl. at 30; McGraw Decl. at 3]. Agent Rabatin also spoke with Mr. Blumenfeld prior to the interview, and "assured him that information obtained in the interview would only be disseminated to appropriate officials in the Department of Justice and the Department of the Treasury." [Rabatin Decl. at 3]. As explained by Agent Rabatin, he "expected that the information provided in the interview would be revealed only to authorized persons in the Department of the Treasury on a need-to-know basis, and to attorneys of the Department of Justice for the purpose of defending plaintiffs' tort claim against the United States." [Rabatin Decl. at 3–4].

According to defendant Davis, he believed that his communications during the interview would be used by the Justice Department to decide whether to grant his request for legal representation, and that his communications would remain "confidential." [Davis Decl. at 22–23]. In his deposition, defendant Davis testified that, based upon Agent Rabatin's statements to him, defendant Davis believed that he was required to attend the meeting in order to provide the IRS with a statement about the incident in connection with its administrative investigation. [De Simone Decl., Ex. A at 6–8]. Defendant Davis understood that the report of his interview "could be used ... for an administrative review of the incident related to the lawsuit." [Davis Decl. at 23].

Following the meeting, Agent Rabatin contacted Mr. McGraw to report what had been discussed, and prepared a memorandum summarizing his interview of defendant Davis. [Rabatin Decl. at 4]. That interview memorandum, which was dated December 13, 1994, was attached as an exhibit to the litigation report sent to Mr. McGraw. The interview memorandum also was attached to an administrative investigation report distributed to various unidentified IRS officials

involved in the administrative review of defendant Davis' conduct. [McGraw Decl. at 3; Rabatin Decl. at 4]. As explained by counsel for the United States during the hearing, the litigation report and the administrative report differed because they were intended for different audiences and designed to serve different purposes. It is the interview memorandum which defendants seek to protect from discovery.

## DISCUSSION

### I. Defendant Davis' assertion of the "joint defense privilege" and the attorney-client privilege.

■ Defendant Davis asserts that the memorandum is not subject to discovery because of what he considers to be three distinct and independent privileges: (1) the attorney-client privilege; (2) the attorney work product doctrine; and (3) the "joint defense privilege." In addition, it appears that defendant Davis is actually asserting two separate variations of the "joint defense privilege": (a) the common defense doctrine, and (b) the joint-client doctrine. Neither doctrine, however, creates a separate privilege independent of the attorney-client privilege or the work product doctrine. Instead, both doctrines are extensions of the attorney-client privilege and the work product doctrine, and apply only if the other conditions of those privileges are satisfied. *See, e.g., Waller v. Financial Corp. of America*, 828 F.2d 579, 583 n. 7 (9th Cir.1987); *United States v. Bay State Ambulance and Hosp. Rental Serv.*, 874 F.2d 20, 28 (1st Cir.1989); *Byrnes v. Jetnet Corp.*, 111 F.R.D. 68, 71 (M.D.N.C.1986); Restatement (Third) of The Law Governing Lawyers, § 126 at 188–189 (Tentative Draft No. 2, 1989). A thorough discussion of both doctrines is necessary in order to understand their application to the memorandum at issue.[4]

4. Where, as in this action, subject matter jurisdiction is based upon the existence of a federal question, privileges are governed by federal common law. Fed.R.Evid. 501; *United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 2625–26, 105 L.Ed.2d 469 (1989). Although this action also invokes the Court's supplemental jurisdiction (28 U.S.C. § 1367) as to state law tort

claims, the parties have limited their arguments in this discovery matter to federal law, and the Court assumes that federal privilege law applies to both defendants' assertions of privilege. *See Miller v. Pancucci*, 141 F.R.D. 292, 299 (C.D.Cal. 1992) (holding federal privilege law controls action involving federal question despite existence

### a. The common defense doctrine.

The common defense doctrine, often referred to as the "joint defense privilege," *See* 24 C. Wright & K. Graham, *Federal Practice and Procedure,* § 5493 (1994), basically expands application of the attorney-client privilege or the work-product doctrine to circumstances in which it otherwise might not apply. *See Haines v. Liggett Group Inc.,* 975 F.2d 81, 94 (3rd Cir.1992) (applying joint defense doctrine to attorney-client privilege); *In re United Mine Workers of America Employee Ben. Plans Lit.* 159 F.R.D. 307, 313 n. 4 (D.D.C.1994) (discussing application of common interest rule to both attorney-client privilege and work product doctrine); *Western Fuels Association, Inc. v. Burlington Northern Railroad Co.,* 102 F.R.D. 201, 203 (D.Wy.1984) (applying doctrine to both attorney-client privilege and work product doctrine). The doctrine qualifies the requirement that a communication be made in confidence, and prevents waiver of the privilege to the extent confidential communications are shared between members of a joint defense. Thus, the existence of a joint defense allows the parties and counsel involved in that defense to disclose privileged information to each other without destroying the privileged nature of those communications. *Metro Wastewater Reclamation v. Continental Cas.,* 142 F.R.D. 471, 478 (D.Colo.1992) (explaining that the allied lawyer doctrine, is "merely an extension of the attorney-client privilege and the work-product doctrine."). The doctrine applies where parties are represented by separate counsel but engage in a common legal enterprise. *United States v. Schwimmer,* 892 F.2d 237, 243 (2nd Cir. 1989); *United States v. Bay State Ambulance and Hosp. Rental Serv.,* 874 F.2d 20, 28 (1st Cir.1989). The doctrine, however, protects communications between an individual and an attorney for another **only** when the communications are part of an "on-going and joint effort to set up a common defense strategy." *Eisenberg v. Gagnon,* 766 F.2d 770, 787 (3rd Cir.), *cert. denied, sub nom., Weinstein v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *see Schwimmer,* 872 F.2d at 243 (explaining that "[o]nly those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected."); *Matter of Bevill, Bresler & Schulman,* 805 F.2d 120, 125 (3rd Cir.1986) (holding that the party seeking the benefit of the joint defense doctrine must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further that effort, and (3) the privilege has not been waived). Where a "joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel," communications may be deemed privileged whether litigation has been commenced against both parties or not.[5] *Schwimmer,* 892 F.2d at 244.

The evidence submitted by defendants establishes that a joint defense effort or strategy had been undertaken by the time defendant Davis was interviewed by Agent Rabatin.[6] Nevertheless, as discussed below, the

---

of state law claims and despite defendants' assertion of state created privilege).

5. For this reason, the fact that the United States had not substituted in as a defendant in this action before the December 14, 1994 meeting does not mean that the common defense did not exist at that time.

6. Plaintiffs and defendant Davis spend much time arguing about whether defendant Davis' interests were sufficiently compatible with those of the United States to support a finding that the two defendants acted pursuant to a common defense. [Davis Motion at 3–4, 9–11; Opposition at 9–10; Reply at 9–13]. The interests of the parties involved in a common defense need not be identical, and, indeed may even be adverse in some respects. *Hunydee v. United States,* 355 F.2d 183, 185 (9th Cir.1965) (applying the joint defense doctrine to statements concerning a matter of common concern, even though co-defendants generally had a significant conflict of interest); *Eisenberg,* 766 F.2d at 787–788 (recognizing that "communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests."); *United States v. McPartlin,* 595 F.2d 1321, 1336 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979) (explaining that co-defendants' interests need not be compatible in all respects, but the statements for which protection is sought must be made "for a common purpose related to both defenses."). In this case, the claims against both defendants involve similar allegations based upon the same incident. Further, defendants face a common adversary. The declarations submitted by defendant constitute sufficient proof that the interests of defendants

memorandum is not shielded from discovery unless it meets the other requirements of either the attorney-client privilege or the work product doctrine.

### b. The joint-client doctrine.

■ Defendant Davis may be attempting to assert the "joint client doctrine," which applies where two clients share the same lawyer. *See, generally, Bank Brussels Lambert v. Credit Lyonnais*, 160 F.R.D. 437 (S.D.N.Y.1995) (explaining that "communications made to the shared attorney to establish a defense strategy remain privileged as to the rest of the world.") (citation omitted); *International Insurance Co. v. Newmont Mining Corp.*, 800 F.Supp. 1195, 1196–1197 (S.D.N.Y.1992) (finding the "common interest doctrine" inapplicable because there was no joint representation). Under this doctrine, communications among joint clients and their counsel are not privileged in disputes between the joint clients, but are protected from disclosure to others.

■ Like the common defense doctrine, the joint client doctrine does not create an independent privilege, but depends upon a proper showing of the other elements of the attorney-client privilege. Thus, the joint client doctrine typically has been applied to overcome what would otherwise have constituted a waiver of confidentiality because a communication had been shared between two clients. *Metro Wastewater Reclamation v. Continental Cas.*, 142 F.R.D. 471, 476 (D.Colo.1992) ("[c]ommunications shared with third persons who have a common legal interest with respect to the subject matter thereof will be deemed neither a breach nor a waiver of the confidentiality surrounding the attorney-client relationship.").

■ Defendant Davis argues that at the time of the meeting, the government had not yet acted on his request for legal representation, and that he reasonably believed that "he would have to provide information to the government to allow it to make an informed

judgment about representation, and that the decision would be made on information he provided." [Reply at 7]. Apparently, then, defendant Davis figures that both he and the United States were clients (or potential clients) of counsel for the United States at the time of the interview. The evidence on this point, however, is ambiguous. In his declaration, defendant Davis stated that,

> [i]n participating in the December 13th meeting referred to above, I believed ... that the Department of Justice would consider the communication in deciding upon my request for legal representation, which it could then use upon any later representation.

[Davis Decl. at 22]. In his deposition, however, defendant Davis testified as follows:

> Q: By Mr. De Simone: Have you given an oral statement in connection with the IRS internal investigation of this incident?
>
> A: Yes.
>
> Q: Who was present during that statement?
>
> A: John Rabbatin [sic], Jim Asperger, Stan Blumenfeld, Myself, and an inspector, Bill Merendolla [sic].
>
> \*    \*    \*    \*    \*    \*
>
> Q: Were you ordered to give that statement as part of your job duties as an IRS special agent?
>
> \*    \*    \*    \*    \*    \*
>
> Q: By Mr. De Simone: Aside from your attorneys, did anyone at the IRS tell you you have to make a statement in connection with this incident?
>
> A: Yes.
>
> Q: Who was that?
>
> A: John Rabbatin [sic].

[De Simone Decl., Ex. A at 6–8].[7] Thus, despite defendant Davis' assertion that he intended his participation in the interview to promote a favorable determination on his request for counsel, he also believed that he

---

Davis and the United States were sufficiently aligned, and support a finding that they had agreed to pursue a joint defense. [*See* McGraw Decl. at 4; Blumenfeld Decl. at 29–30; Davis Decl. at 21–22].

**7.** Agent Rabatin's declaration does not contradict defendant Davis' testimony on this point.

was required by his employer to provide a statement to Agent Rabatin. Further, defendant Davis understood that the information he provided during the interview could be used in the administrative investigation, as well. [Davis Decl. at 8]. Given these facts, defendant Davis did not participate in the interview solely as potential joint-client of counsel for the United States. He also participated as an employee fulfilling what he perceived as his obligation to his employer. Moreover, even if the joint-client doctrine were applicable, the memorandum still must satisfy the other requirements of either the attorney-client privilege or the work product doctrine.

### c. Attorney-client privilege.

"The party asserting an evidentiary privilege has the burden to demonstrate that the privilege applies to the information in question." *Tornay v. United States,* 840 F.2d 1424, 1426 (9th Cir.1988). Because the attorney-client privilege withholds relevant information from the fact-finder, it "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). As stated by the Ninth Circuit, the attorney-client privilege should apply "only when necessary to effectuate its limited purpose of encouraging complete disclosure by the client." *Tornay,* 840 F.2d at 1428, citing *United States v. Osborn,* 561 F.2d 1334, 1339 (9th Cir.1977).

The attorney-client privilege applies when (1) legal advice is sought (2) from a professional legal advisor in his capacity as such, and (3) the communications relating to that purpose (4) are made in confidence (5) by, the client. *Admiral Ins. v. U.S. Dist. Court,* 881 F.2d 1486, 1492 (9th Cir.1989), citing *In re Fischel* 557 F.2d 209, 211 (9th Cir.1977). Where applicable, the privilege protects a communication from discovery so long as the privilege has not been waived. *Admiral Ins.,* 881 F.2d at 1492.

### 1. Confidentiality.

One of the essential elements of the attorney-client privilege is the intent that the communication be kept confidential. *See United States v. Miller,* 874 F.2d 1255 (9th Cir.1989). Importantly, neither the existence of a common defense nor the fact that individuals are joint clients satisfies the requirement of confidentiality. *See Bay State Ambulance,* 874 F.2d at 28. As an example, the presence of an individual who is not a member of the common defense effort may negate the privilege where that person's presence is known to and accepted by the participants. Restatement (Third) of the Law Governing Lawyers, § 126 at 190 (Tentative Draft No. 2, 1989). For this reason, courts have consistently refused to apply the privilege to information that the client intends or understands may be conveyed to others. *In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir.1984); *United States v. Tellier,* 255 F.2d 441, 447 (2nd Cir.1957), *cert. denied,* 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958); *United States v. Pipkins,* 528 F.2d 559, 563 (5th Cir.1976), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976); *United States v. Cote,* 456 F.2d 142, 144 (8th Cir.1972); *Wilcoxon v. United States,* 231 F.2d 384, 386 (10th Cir.1955), *cert. denied,* 351 U.S. 943, 76 S.Ct. 834, 100 L.Ed. 1469 (1956); *Southern Film Extruders, Inc. v. Coca–Cola Co.,* 117 F.R.D. 559, 562 (M.D.N.C.1987). This refusal is not based upon a finding of waiver of the privilege due to disclosure to third parties. Rather, courts find that the privilege never attached to the communications at all.[8]

Defendant Davis correctly points out that whether or not a given communication is "confidential" within the meaning of the privilege is determined from the perspective of the client—that is, defendant Davis. *United States v. Moscony,* 927 F.2d 742, 751–752 (3rd Cir.), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991); *Bay State Ambulance,* 874 F.2d at 28. The client's expectation of confidentiality, however, must be reasonable. *Bay State Ambulance,* 874 F.2d at 28; *Moscony,* 927 F.2d at

---

8. As explained by the Eighth Circuit in *Cote:* "[i]n tax cases waiver is often not even an issue since the privilege is said not to attach to information which the taxpayer intends his attorney to report in the contents of a tax return." *Cote,* 456 F.2d at 145 n. 3.

752; *Kevlik v. Goldstein,* 724 F.2d 844, 849 (1st Cir.1984). So, for example, a claim of confidentiality may be defeated where the client knowingly makes the communication in the presence of a third party. *United States v. Rockwell International,* 897 F.2d 1255, 1265 (3rd Cir.1990) ("The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties or that in fact are so disclosed."). Similarly, information communicated by a client which he knew would be disclosed in legal documents lacks the requisite confidentiality, and is not privileged. *See Moscony,* 927 F.2d at 751–752 (discussing general principles of confidentiality); *In re Grand Jury Proceedings,* 727 F.2d 1352 (holding that information given to attorney to prepare prospectus to be published to others was not privileged even though prospectus was never issued); *In re LTV Securities Litigation,* 89 F.R.D. 595, 602–604 (N.D.Tex.1981) (explaining that communications may be deemed confidential "where it is reasonable to assume that disclosure to third parties was not intended."). The decisive inquiry is "whether the client reasonably understood the conference to be confidential." *Kevlik,* 724 F.2d at 849, quoting *McCormick on Evidence* § 91 at 189 (1972); *United States v. Schaltenbrand,* 930 F.2d 1554, 1562 (11th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991).

In *Gonzales v. Municipal Court,* 67 Cal. App.3d 111, 136 Cal.Rptr. 475 (1977), a case factually similar to this case, an arrestee complained that the arresting officer used excessive force against him. Pursuant to that complaint, the Internal Affairs Department ("IAD") began an investigation of the incident. While the primary purpose of the investigation was to gather evidence for use by the city attorney in defense of any civil action against the police officer or the city arising from the incident, the secondary purpose of the investigation was to discover if any grounds for disciplining the officer exist-

ed. *Gonzales,* 67 Cal.App.3d at 116, 136 Cal.Rptr. 475. The police officer subsequently attempted to withhold from discovery his statements to the Internal Affairs Department investigators by asserting the attorney-client privilege. The California Court of Appeal rejected his attempt, finding that, as a matter of law, the officer's statements to the IAD investigators were not intended to be confidential as that term is defined within the context of the attorney-client privilege. *Gonzales,* 67 Cal.App.3d at 118, 136 Cal.Rptr. 475. The court explained that, if a client communicates with his attorney with the intention that the communication be conveyed to another, that communication is not confidential and, therefore not privileged. *Gonzales,* 67 Cal.App.3d at 118–119, 136 Cal.Rptr. 475. This is true "notwithstanding the protestations of the client as to his subjective intent." *Gonzales,* 67 Cal.App.3d at 119, 136 Cal.Rptr. 475.

Thus, had Officer Curiel made the statements in question to two persons, one acting as agent of the city attorney, and the other acting as representative of the police department investigating grounds for possible discipline, it is apparent that the presence of the latter part would preclude the officer's assertion of the attorney-client privilege. The fact that a single person represented both the city attorney and the police department should not change the result. In either case, as the client knows, the communication is not confined to the attorney-client relationship.

*Gonzales,* 67 Cal.App.3d at 119, 136 Cal.Rptr. 475. The court recognized that the issue of confidentiality is judged from the perspective of the person making the statement, but held that the officer could not have expected his statements to be confidential given his understanding that they would be used in his disciplinary proceedings as well as by the city attorney. *Gonzales,* 67 Cal.App.3d at 120, 136 Cal.Rptr. 475.[9]

---

9. Defendant Davis argues that *Gonzales* is inapplicable because it involves state law, and because it involves the right to discovery in a criminal prosecution. [Reply at 15–17]. While California law is not binding, *See* Fed.R.Evid. 501, the Court may consider state privilege law in determining federal law of privilege. *Lewis v.*

*United States,* 517 F.2d 236, 237 (9th Cir.1975). "[T]he rule ultimately adopted, whatever its substance, is not state law, but federal common law." *Lewis,* 517 F.2d at 237. Further, although *Gonzales* involved a criminal defendant's right to discovery, the court of appeal's analysis

Like *Gonzales, Bay State Ambulance,* 874 F.2d 20, involved the issue of the reasonableness of a client's belief that his communication was confidential. In *Bay State Ambulance,* the FBI undertook an investigation of Bay State Ambulance. During the course of the investigation, Bay State's in-house counsel requested information from Felci, who was a city employee and who also had performed work for Bay State. The in-house counsel informed Felci that the information was necessary in order to address questions raised by the FBI. *Bay State Ambulance,* 874 F.2d at 29. At the time of the request, Felci had already obtained another attorney. *Bay State Ambulance,* 874 F.2d at 26. Felci prepared an outline containing the information, and gave it to in-house counsel. In-house counsel then turned the outline over to the FBI. Subsequently, both Felci and Bay State were charged with Medicare fraud. *Bay State Ambulance,* 874 F.2d at 27.

■■■ At trial, Felci argued that the joint defense privilege prevented disclosure of the outline he had prepared and given to Bay State's in-house counsel. In analyzing Felci's contention, the court began by noting that one of the prerequisites for protection under the "joint defense privilege" is that the communications were made in confidence. *Bay State Ambulance,* 874 F.2d at 28. The court explained that the question of confidentiality depends upon what the client **reasonably** understood. The court then rejected Felci's claim of privilege, finding that, because Felci had no reason to believe that the in-house counsel would not share the outline with the FBI—which had interests adverse to Felci with respect to the information— Felci could have no reasonable expectation that the outline would remain confidential. *Bay State Ambulance,* 874 F.2d at 29.[10]

Here, defendant Davis conceded that he believed he was obligated to make a statement to his employer (the IRS), and he believed that he was making such a statement at the December 13, 1994 interview.

[De Simone Decl., Ex. A at 6–8]. Defendant Davis also forthrightly admits that he believed that his statements "could be used on a restricted basis for an administrative review of the incident related to the lawsuit." [Davis Decl. at 23]. Although the IRS may not have been an "adverse party," in the same sense as the FBI was in *Bay State Ambulance,* the principle is the same. Defendant Davis admittedly understood in advance that use and disclosure of the statements he made during the interview would not be confined to the attorney-client relationship. Furthermore, as evidenced by his inclusion of the interview memorandum in his administrative report, Agent Rabatin was acting as an IRS investigator throughout the course of the administrative investigation (as early as March, 1994), including at the December 13, 1994 interview. [*See* Rabatin Decl. at 3]. This remains true despite the fact that Agent Rabatin later assumed a second role as agent for government counsel. Knowing that Agent Rabatin could use the interview for purposes *other than* to either (a) make a determination as to defendant Davis' request for representation, or (b) further the joint defense, defendant Davis nonetheless elected to proceed. Given defendant Davis' admissions regarding his understanding of the nature of the interview, and despite his protestations to the contrary, he could have no reasonable expectation that his statements would remain confidential. *See Gonzales,* 67 Cal.App.3d at 119, 136 Cal.Rptr. 475; *Bay State Hospital,* 874 F.2d at 29. As a result, his statements during the interview were not protected by the attorney-client privilege.

■■■ Application of the "joint defense privilege" does not and should not circumvent the requirement that the statements be made in confidence. *See Western Fuels Association,* 102 F.R.D. at 203 ("a party to joint defense communications may waive the attorney-client privilege by disclosing such confidential information to persons outside the scope of the joint defense relationship."); *In*

---

of the attorney-client privilege remains persuasive.

**10.** The court also rejected Felci's assertion of privilege on the ground that he failed to meet his burden of showing that the outline was prepared as part of a joint defense. *Bay State Ambulance,* 874 F.2d at 29.

*re LTV Securities Litigation,* 89 F.R.D. at 604 (stating that an exchange of information must be made in confidence, and for the limited purpose of assisting the common defense, for the joint defense doctrine to apply.) Otherwise, communications made by parties involved in a joint defense would receive a broader protection than communications made in a direct attorney-client relationship. Nor should the fact that the government chose to make dual use of Agent Rabatin—as both an IRS investigator and an agent for Mr. McGraw—render privileged statements which would otherwise be subject to discovery. *See Gonzales,* 67 Cal.App.3d at 119, 136 Cal.Rptr. 475. In other words, defendant Davis cannot prevent disclosure of an administrative investigation by having its litigation counsel (or an agent of its litigation counsel) conduct that investigation.

## 2. Primary purpose of the interview.

█ A party seeking to withhold discovery based upon the attorney-client privilege must prove that all of the communications it seeks to protect were made "**primarily** for the purpose of generating legal advice." *McCaugherty v. Siffermann,* 132 F.R.D. 234, 238 (N.D.Cal.1990) (emphasis in original).

> No privilege can attach to any communication as to which a business purpose would have served as a **sufficient cause,** i.e., any communication that would have been made because of a business purpose, even if there had been no perceived additional interest in securing legal advice.

*McCaugherty,* 132 F.R.D. at 238 (emphasis added). This requirement has not been satisfied.

█ Defendant Davis states that his objective in agreeing to the meeting was to provide the United States with information enabling it to determine whether or not to represent him. [Davis Decl. at 22]. Yet, the evidence also supports a finding that defendant Davis would have made his statements to Agent Rabatin pursuant to his perceived obligation to the IRS—regardless of the fact that the interview may have served the dual purpose of providing information to the government attorneys. [*See* De Simone Decl., Ex. A at 6–8; Davis Decl. at 23; Rabatin Decl. at 3]. Given defendant Davis' admission that he believed that he was required to give a statement, and given that defendant Davis was aware that his interview was, *at least in part,* directed to an administrative investigation of the incident, it could be argued that his participation in the interview was neither primarily for the purpose of obtaining legal advice, nor primarily for the purpose of furthering a common defense with the United States. *See United States v. Sawyer,* 878 F.Supp. 295, 297 (D.Mass.1995) (rejecting a defendant's claim of joint defense privilege, based upon a finding that the defendant met with corporate and in-house counsel "not to promote a joint defense, but as part of an internal investigation to discover facts relevant to the defendant's [allegedly illegal] expenditures...." and "to fulfill his duties and obligations to report to his employer."). Instead, defendant Davis' statements to Agent Rabatin would have been made pursuant to his perceived obligation to his employer, that is, they would have made even if there was no additional interest in securing legal advice. Because his obligations regarding the administrative investigation probably would have served as a **sufficient cause** of defendant Davis' statements, no attorney-client privilege attached to those statements.[11] *See McCaugherty,* 132 F.R.D. at 238.

**11.** In his response to the Court's order requiring submission of the memorandum for possible *in camera* review, defendant Davis describes *Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 115 F.R.D. 308 (N.D.Cal.1987) as holding follows: "joint-defense privilege unaffected by fact that information was shared for business as well as litigation purpose." [Response at 3–4]. *Hewlett-Packard,* however, does not contain any such holding. In that case, Bausch & Lomb voluntarily disclosed its attorney's opinion letter to a non-party ("GEC") with whom it was attempting to negotiate the sale of a business. The letter expressed the attorney's opinion as to the validity of a patent which was part of the business that GEC was considering purchasing. The court began by finding that Bausch & Lomb had a duty to disclose to GEC the existence of a potential lawsuit over the right to the patent. *Hewlett-Packard,* 115 F.R.D. at 308. The court then performed a thorough analysis of the policy rationale for declining to find a waiver under such circumstances. *Hewlett-Packard,* 115 F.R.D. at 310–312. The central issue in *Hewlett-Packard* was whether such disclosure amounted to a

### 3. Waiver.

█ Even if defendant Davis' statements initially were protected by the attorney-client privilege, any such privilege has been waived by the voluntary disclosure of his statements to the IRS.

█ Voluntary disclosure of a privileged communication to a third person destroys confidentiality and constitutes a waiver of the privilege. *Clady v. County of Los Angeles*, 770 F.2d 1421, 1433 (9th Cir.1985), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986); *Weil v. Investment/Indicators, Research & Management, Inc.*, 647 F.2d 18, 24 (9th Cir.1981); *United States v. El Paso Co.*, 682 F.2d 530, 539–541 (5th Cir.1982), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984). Although an attorney may not waive the privilege without his client's consent, *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455 (N.D.Cal. 1978), waiver may occur if the client permits his attorney to disclose the communication to third parties. *See United States v. Suarez*, 820 F.2d 1158, 1160–1161 (11th Cir.) (holding that where client permitted attorney to disclose communications client waived the privilege), *cert. denied*, 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987). Further, by his actions, the client may impliedly waive the privilege or consent to disclosure. *In re von Bulow*, 828 F.2d 94, 101 (2nd Cir.1987).

█ Here, defendant Davis consented to the disclosure of his interview statements to the IRS officials conducting the administrative investigation. Defendants do not contend that the IRS officials conducting the administrative investigation were parties to the common defense. Instead, the IRS officials had a "neutral or adverse position vis-a-vis the subject of the communication." *See In re Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974*, 406 F.Supp. 381, 386 (S.D.N.Y.1975). Consequently, defendant Davis's consent to disclosure to the IRS of

his statements resulted in a waiver of any attorney-client privilege which may have attached to those statements. This is true despite any agreement defendants may have had with the IRS regarding the "restricted" nature of the memorandum. *Westinghouse v. Republic of the Philippines*, 951 F.2d 1414, 1427 (3rd Cir.1991) (holding that voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communication to anyone else).[12]

## II. Defendants Davis and United States' assertion of the work product doctrine.

Both defendant Davis and defendant United States assert the attorney work product as a basis for a protective order. The analysis for both party's assertions of the doctrine is the same.

The attorney work product doctrine is contained in Rule 26(b)(3) of the Federal Rules of Civil Procedure. That subsection provides in part:

[A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial ... only upon a showing that the party seeking discovery has substantial need of the materials ... and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

█ Rule 26(b)(3) protects documents and things prepared in anticipation of litigation or for trial. *See* 8 C. Wright, A. Miller & R. Marcus, *Federal Practice and Procedure:* Civil § 2024 (1970). The work product doctrine does not protect materials assembled in the ordinary course of business. Rather, the *primary* motivating purpose behind the creation of the materials must be as an aid in possible future litigation. *See United States v. Davis*, 636 F.2d 1028, 1040 (5th

---

waiver of either the attorney-client privilege or work product protection which had already attached to the letter at the time it was created. Because in this case no attorney-client privilege ever attached to the interview memorandum, *Hewlett–Packard* is inapposite.

**12.** Defendant Davis has expressly elected not to assert the official government information privilege. [Reply at 22–23]. Thus, there is no need to address plaintiffs' lengthy discussion of that privilege, including the balancing test set forth in *Kelly*, 114 F.R.D. at 659. [*See* Opposition at 14–17].

Cir.1981); *In re Bairnco Corporation Securities Litigation,* 148 F.R.D. 91, 102–103 (S.D.N.Y.1993). That is, work product protection applies only to material **"that would not have been generated but for the pendency or imminence of litigation."** *Kelly v. City of San Jose,* 114 F.R.D. 653, 659 (N.D.Cal.1987) (emphasis added).

Because defendants have made a sufficient showing that they were pursuing a common defense, the Court assumes that Agent Rabatin was acting as the agent of counsel for both defendant Davis and the United States at the time he prepared the interview memorandum. Nevertheless, defendants' reliance on the attorney work product doctrine fails.

■■■ While Agent Rabatin may have been acting as an agent for defendants' counsel, he was also simultaneously preparing an administrative report for the IRS in his role as an IRS investigator. [*See* Rabatin Decl. at 2–3]. Defendant Davis was aware of the fact that Agent Rabatin could and would make use of the interview in conjunction with the administrative investigation, and provided statements to Agent Rabatin, at least in part, pursuant to his perceived obligation to the IRS. Agent Rabatin subsequently attached the interview memorandum to the administrative report which was disseminated to IRS officials involved in the administrative investigation. Thus, the memorandum of the interview (as opposed to the litigation report) was not prepared primarily in anticipation of litigation.[13] *See Davis,* 636 F.2d at 1040. Rather, it was prepared for dual purposes. Indeed, one of those purposes—as part of the IRS's administrative investigation of defendant Davis—was completely unrelated to any other use the memorandum might have as an aid in future litigation. Because the memorandum would have been generated whether or not litigation was pending, it does not qualify as attorney work product. *See Kelly,* 114 F.R.D. at 659 (holding that, "[s]ince police departments are under an affirmative duty, in the normal course of serving their public function," to generate documents such as internal investigation reports, "the policies that inspire the work product doctrine are wholly inapplicable.") (emphasis in original);[14] *see also, In re Bairnco Corporation Securities Litigation,* 148 F.R.D. at 103 (finding documents not protected as work product where they were generated for purposes other than to assist in preparation for litigation).

■■■ Furthermore, even if the memorandum could be considered work product, defendants have waived any protection. Where a party discloses work product for reasons not related to the facilitation of its trial preparation, the work product protection may be waived. *In re Crazy Eddie Securities Litigation,* 131 F.R.D. 374, 379 (E.D.N.Y.1990). Disclosure of work product to third persons, however, does not automatically waive the protection. *Samuels v. Mitchell,* 155 F.R.D. 195, 200 (N.D.Cal.1994). Instead, waiver is found where the disclosure "substantially increases the opportunity for potential adversaries to obtain the information." *Samuels,* 155 F.R.D. at 200–201; 8 C. Wright, A. Miller & R. Marcus, *Federal Practice & Procedure:* Civil § 2024 at 369 (1994). Thus, work product protection is forfeited by disclosure "in circumstances in which the attorney cannot reasonably expect to limit the future use of the otherwise protected material." *In re Doe,* 662 F.2d 1073, 1081 (4th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). Moreover, waiver occurs despite any agree-

---

**13.** While the litigation report may have been prepared in anticipation of litigation, and, therefore, protected as work product, attaching the interview memorandum to the litigation report does not convert the memorandum to work product.

**14.** Defendant Davis also argues that the investigation was not routine, because the IRS has no established procedure for an administrative review of an officer-involved-shooting. [Reply at 18]. His argument is unavailing. The fact that the administrative investigation was not routine indicates that the IRS may not have been under an "affirmative duty" to investigate defendant Davis's conduct. Still, it does not alter the fact that one of Agent Rabatin's purposes in preparing the memorandum was to facilitate an administrative determination of whether defendant Davis violated IRS regulations. In other words, the non-routine nature of the administrative investigation has no bearing on whether the memorandum was prepared primarily in anticipation of litigation.

ment by the parties that the information disclosed will remain confidential as against the rest of the world. *In re Chrysler Motors Corp. v. Overnight Evaluation Program Litigation,* 860 F.2d 844, 847 (8th Cir.1988) (disclosure to persons outside attorney-client relationship eliminates confidentiality which is "the dispositive factor in deciding whether material is privileged.").

██ Here, Agent Rabatin disseminated the memorandum to various unidentified IRS officials involved in the administrative investigation of defendant Davis. That dissemination was not intended to facilitate preparation for litigation. Importantly, counsel for both defendant Davis and defendant United States understood that the memorandum could and would be put to such use. Although aware of the dissemination of the memorandum, counsel for neither defendant Davis nor defendant United States attempted to prevent or object to it. Further, well-settled law provides limited protection from discovery of relevant administrative files, including administrative investigation reports. *See, e.g., Kelly v. City of San Jose,* 114 F.R.D. 653, 661–663 (N.D.Cal.1987) (discussing whether reports prepared in conjunction with police department's internal investigation were privileged from discovery); *Miller v. Pancucci,* 141 F.R.D. 292, 300–302 (C.D.Cal.1992) (discussing the procedure for invoking "official information" privilege, and finding contents of police officer defendant's internal investigation file were not entitled to protection from discovery under that privilege). Defense counsel are charged with knowledge that administrative investigation reports are not necessarily protected from discovery. This knowledge, together with the parties' mutual understanding that one of the purposes of the interview involved the administrative investigation, demonstrates that defense counsel could not reasonably have expected to limit the future use of the interview memorandum once it had been dis-

seminated to the IRS. *See In re Doe,* 662 F.2d at 1081.

██ Neither the fact that the memorandum was distributed to what defendant United States believes to be a limited group of IRS officials, nor the fact that the memorandum was attached to an administrative report with a bright orange sheet bearing the words "[t]his document requires protection," negate the fact that the memorandum was voluntarily disseminated to persons unrelated to the litigation, for purposes not in furtherance of preparation for litigation.[15] Defendants' knowing disclosure of the memorandum substantially increased the opportunity for potential adversaries to obtain the memorandum. *See Samuels,* 155 F.R.D. at 200–201. In sum, if any work product protection attached to the interview memorandum, it has been waived.[16] *See Western Fuels Association,* 102 F.R.D. at 203 ("a party to joint defense communications may waive the work product privilege by disclosing such privileged information to third parties in such a manner as is inconsistent with the purpose of maintaining the secrecy of such information from current or potential adversaries."); *Westinghouse,* 951 F.2d at 1429 (holding that voluntary disclosure of work product to the SEC in order to cooperate with a government investigation waived the privilege); *In re Worlds of Wonder Securities Litigation,* 147 F.R.D. 208, 211–212 (N.D.Cal.1992) (holding work product immunity waived as against all adversaries by voluntary disclosure to the SEC during an informal investigation, even where corporation expressly reserved all of its rights, submitted information confidentially, and requested confidential treatment from Freedom of Information Act officer).

The decision in *Hewlett–Packard* does not support a different conclusion. As discussed, the court in *Hewlett–Packard* was influenced by the potential effects of finding waiver too

---

15. The agreement between defendants Davis and the United States that disclosure to the IRS would be limited and that the memorandum would remain "confidential" does not avoid the consequence of defendants' knowing disclosure of the memorandum to IRS officials. *See Chrysler Motors Corp.,* 860 F.2d at 847.

16. Defendant Davis was fully aware of the potential for disclosure of the interview memorandum to persons outside of the attorney-client relationship before he agreed to participate in the interview. His agreement to participate in the interview manifests his consent to that disclosure.

freely in commercial transactions such as the sale of a business. For example, the court explained that:

> [u]nless it serves some significant interest courts should not create procedural doctrine that restricts communication between buyers and seller, erects barriers to business deals, and increases the risk that prospective buyers will not have access to important information that could play key roles in assessing the value of the business or product they are considering buying.

*Hewlett–Packard,* 115 F.R.D. at 311. The court concluded that "in a close case such as this the policy concerns outlined above dictate that the attorney-client privilege should be protected and waiver should not be found." *Hewlett–Packard,* 115 F.R.D. at 312.

The same policy concerns are not applicable in this case. To the contrary, sound policy supports a finding of waiver. Neither cooperation with administrative investigations nor participation in common defenses will be discouraged by the Court's ruling, because the waiver could easily have been avoided. That is, the government could have conducted two separate interviews with defendant Davis, utilizing two separate agents (one representing the IRS and one representing counsel for the United States), in order to serve the two distinct purposes (the administrative investigation and the common defense). Defendant Davis' counsel could have requested such a procedure. Under those circumstances, any document prepared by counsel for the United States would be entitled to work product protection. Any document created by the IRS, on the other hand, would not be entitled to such protection as it was not prepared in anticipation of litigation. Alternatively, defendant Davis'

counsel could have requested that the administrative investigation be postponed until the completion of the litigation.

### III. Defendant United States' assertion of the "self-critical analysis privilege."

Defendant United States also seeks a protective order based upon its assertion of the "self-critical analysis privilege." The Ninth Circuit does not recognize the privilege of "self-critical analysis." *Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423 (9th Cir. 1992). Because the rationale underlying basis of the "self-critical analysis privilege" is questionable, the Court declines to rely upon it in this case.[17] *See Aramburu v. Boeing Company,* 885 F.Supp. 1434, (D.Kan.1995) (analyzing and rejecting the "self-critical analysis privilege"); *Mason v. Stock,* 869 F.Supp. 828, 834 (D.Kan.1994) (noting that, even if the "self-critical analysis privilege" existed, it would not apply to internal investigations of police officer defendants in section 1983 case).

Because the interview memorandum at issue is not privileged, defendants' motions for an order authorizing them to withhold it from production to plaintiffs are **denied.** If defendants wish to seek a protective order prohibiting disclosure of the memorandum to parties other than plaintiffs, they shall file and serve an application for such an order within ten (10) days of the date of this Order.

**IT IS SO ORDERED.**

---

**17.** Although the Court in *Dowling* alternatively analyzed the claim of privilege by assuming the existence of the privilege, there has been no case in the Ninth Circuit that has explicitly adopted the self-critical analysis privilege nor has any

court in this circuit found any document protected from discovery based upon that privilege. *See Pagano v. Oroville Hospital,* 145 F.R.D. 683, 692 (E.D.Cal.1993); *T.W.A.R., Inc. v. Pacific Bell,* 145 F.R.D. 105, 108 (N.D.Cal.1992).